# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

TECHMATIC, INC.,         )
                                  )

    Plaintiff/Counter-Defendant,   )
                                  )

v.                           )    **Case No. 3:20-cv-01078**
                                  )    **Judge Aleta A. Trauger**

PLATING SPECIALISTS, INC.,   )
PATRICK MURPHY, BARRY     )
SCHROER, MICHAEL O'ROURKE,  )
HENDRIK GREVE, BRIAN GREENE, )
and PAVCO, INC.,            )
                                  )

    Defendants/Counter-Plaintiffs.   )

## MEMORANDUM

Presently before the court are (1) the Renewed Partial Motion to Dismiss (Doc. No. 83), filed by defendants Plating Specialists, Inc. ("PSI"), Patrick Murphy, Barry Schroer, Michael O'Rourke, Hendrik Greve, and Brian Greene (collectively, the "PSI defendants," unless necessary to distinguish among them), seeking dismissal of nine of the twelve claims asserted against them in plaintiff Techmatic, Inc.'s Second Amended Complaint ("SAC") (Doc. No. 64); and (2) the Motion to Dismiss filed by defendant Pavco, Inc. ("Pavco") (Doc. No. 90), seeking dismissal of all five of the claims in the SAC asserted against Pavco.[1] The plaintiff has filed a Response in Opposition to both Motions to Dismiss (Doc. Nos. 96, 100), and both sets of defendants have filed Replies (Doc. Nos. 97, 103.)

For the reasons set forth herein, the PSI defendants' motion will be granted in part and

---

[1] The court addresses the plaintiff's Motion to Dismiss the PSI defendants' Counterclaims in a separate Memorandum and Order.

denied in part, and Pavco's motion will be granted in its entirety.

## I.     THE FACTS ALLEGED IN THE SAC[2]

### A.     The Parties

Techmatic, Inc. ("Techmatic"), a Tennessee corporation headquartered in Nashville, Tennessee, is a supplier of chemicals used to apply coatings on metal and auxiliary equipment for the metal finishing industry. Techmatic's President and CEO is John Murphy.

Defendant PSI is also in the business of selling chemicals for coatings on metals and equipment in the metal finishing industry. It is an Ohio corporation based in Fort Thomas, Kentucky. Defendant Brian Greene, an Indiana resident, is President of PSI.

Pavco Inc. ("Pavco") is in the business of manufacturing and supplying chemicals worldwide for coatings on metals and equipment in the metal finishing industry. It is an Ohio corporation based in Charlotte, North Carolina.

Defendant Barry Schroer was employed by Techmatic from 1994 until his resignation in May 2018. He served on Techmatic's Board of Directors from 2010 through 2017, and he held the position of Business Development Manager from 2010 until his resignation.

Defendant Pat Murphy[3] was employed by Techmatic as a salesperson from 1987 until his resignation on January 27, 2020, and he served on Techmatic's Board of Directors from March 2017 until his resignation. Defendant Michael O'Rourke was employed by Techmatic as a salesperson from 2013 until his resignation on January 27, 2020. Hendrik "Hank" Greve was

---

[2] All of the facts set forth herein are drawn from the SAC and exhibits attached to the original Complaint and incorporated by reference in the SAC. The court provides citations only when quoting directly.

[3] The court refers herein to defendant Pat Murphy by his last name only and to Techmatic's principal, John Murphy, by both first and last name. The record does not reflect that Pat Murphy and John Murphy are related.

employed by Techmatic as a salesperson from 2008 until his resignation on January 26, 2020.

**B.    Confidentiality Agreements**

Schroer entered into a Confidentiality Agreement with Techmatic upon his employment in September 1994. He signed another version of the Confidentiality Agreement in July 2004. Murphy entered into a Confidentiality Agreement upon his employment in 1987 and another one in 2004.

O'Rourke entered into an Incorporated Employee Non-Compete Agreement and Confidentiality Agreement in February 2013, even before he began his employment in April 2013. Greve entered into an Incorporated Employee Non-Compete Agreement and Confidentiality Agreement upon his employment in January 2008.

Techmatic asserts that it invested substantial time and effort in training Schroer, Murphy, O'Rourke, and Greve and that each of the individual defendants was provided access to Techmatic's trade secrets and confidential information, including information about its proprietary formulas and blends. Schroer, Murphy, O'Rourke, and Greve were each provided a Techmatic-issued laptop computer in conjunction with their employment. Their authority to access the computers and the information on the computers was "based on their status" as Techmatic employees, as well as their "contractual, statutory, and fiduciary duties to Techmatic." (SAC ¶ 31.)

**C.    Competition and Trade Secrets in the Metal Finishing Industry**

Techmatic, in addition to supplying and distributing products purchased from other entities, also sells "proprietary chemical blends" developed by its own experts, and it has other formulas "blended by suppliers for its customers." (SAC ¶¶ 13, 33.) These formulas are "highly proprietary" and provide Techmatic a competitive advantage. (SAC ¶ 33.)

The metal finishing industry relies on "precise, quality chemicals" and on "close, trust-based client relationships." (SAC ¶ 32.) Very slight variations in the chemical composition of

metal-finishing products can have "disastrous effects" on the metal-finishing process, "making demand for tailored chemistries highly inelastic, establishing substantial barriers to entry, and making sudden supply-chain changes virtually impossible." (SAC ¶ 34.)

Techmatic alleges that it and PSI "were competitors in the metal finishing industry," because both were authorized distributors of Pavco products "in different regions" of the United States. (SAC ¶ 36.) Pavco "pressures its distributors" to sell Pavco products exclusively. (SAC ¶ 37.) It provided Techmatic a copy of its Distributor Policy that "further pressured" Techmatic to sell Pavco products exclusively. (SAC ¶ 38.) However, Techmatic was never required to sign the Distributor Policy and did not enter into an exclusive distributorship agreement with Pavco. In fact, for the duration of its relationship with Pavco, Techmatic stocked and sold metal finishing chemicals from a variety of sources in order to best meet its customers' needs. According to Techmatic, PSI also purchased products from Pavco as well as from Pavco's competitors.

Beginning in 1988, Techmatic was the authorized distributor of Pavco products in a region encompassing Alabama, Georgia, Arkansas, Mississippi, North Carolina, South Carolina, Kentucky, and Tennessee, as well as parts of Indiana and Virginia. PSI was, and continues to be, the authorized distributor of Pavco products in a region comprised of Indiana, Ohio, Louisiana, Oklahoma, Texas, New Mexico, and part of Kentucky. Pavco permitted "some intra-brand" competition, insofar as Techmatic's and PSI's regions overlapped in part of Kentucky. (SAC ¶ 42.) In addition, Pavco retained the right to sell products directly to customers.

Techmatic maintains that it invested substantial resources in identifying potential customers and in developing relationships with customers and potential customers of Pavco products throughout its defined territory, and it protected its customer lists, supplier lists, customer formulas, and pricing information through the use of its Confidentiality Agreements with its

employees, including those signed by Schroer, Murphy, O'Rourke, and Greve, and the Non-Compete Agreements signed by O'Rourke and Greve. Much of this information was maintained on, or could be accessed through, its employees' Techmatic-issued laptop computers. In addition, Techmatic employees were "under specific orders" not to disclose any of this information to Techmatic suppliers, including Pavco. (SAC ¶ 46.)

### D. Schroer's Departure from Techmatic

Schroer resigned from Techmatic on May 14, 2018. He "established a formal employment relationship" with PSI "around the same time," despite the "restraints" placed upon Schroer by his Confidentiality Agreement. (SAC ¶ 62.)

Upon his resignation, Schroer was no longer authorized to access or use his Techmatic-issued computer. Pursuant to the terms of his Confidentiality Agreement, he was bound not to "use for [himself] or others, or disclose or divulge to others any trade secrets, confidential information, or any other data of the Company," both during and after his employment. (SAC ¶ 52.) Upon the termination of his employment, he was obligated to return to Techmatic any documents in his possession relating in any way to the company or its business, as well as the Techmatic-issued computer and all data on it.

Schroer was reminded of these obligations by a letter from Techmatic's president, John Murphy, at the time of his separation from the company. Techmatic alleges, however, that, after resigning, Schroer "imaged copies of his Techmatic-issued laptop work computer's hard drive" and then "deleted Techmatic's data and original files (including but not limited to customer lists, other customer information, proprietary chemical formulas, supplier information, profit margins, and other pricing information) from the laptop before returning it to Techmatic." (SAC ¶ 55.) Techmatic claims that the deleted data included Techmatic's trade secrets and confidential business information as well as evidence of Schroer's misconduct; it also asserts that deleting the

data constituted a breach of Schroer's Confidentiality Agreement.

Techmatic further alleges that Schroer transmitted the data he deleted from his Techmatic computer to PSI and that the transmission of this data constituted a breach of his Confidentiality Agreement as well as misappropriation of Techmatic's trade secrets. Techmatic asserts that PSI, Brian Greene, Schroer, and their "co-conspirators" continue to use this information as part of PSI's business, to Techmatic's disadvantage. (SAC ¶ 61.)

During his "final months" of employment with Techmatic, Schroer purportedly engaged in conduct that was calculated to increase Techmatic's customers' reliance on Pavco products and thus to "maximize the impact" of Schroer's efforts to steal Techmatic's trade secrets and confidential information, in order to "disrupt Techmatic's relationship with Pavco and customers dependent on Pavco products." (SAC ¶ 63.) Schroer violated his Confidentiality Agreement by using Techmatic's supplier contacts and proprietary formulas to arrange for new business for PSI, and he and PSI transmitted Techmatic's confidential and trade secret information to Pavco "in an effort to interfere with Techmatic's distributorship relationship with Pavco." (SAC ¶ 68.)

### E.     The Conspiracy Allegations

Schroer remained in contact with certain Techmatic employees after he began his employment with PSI. He allegedly engaged with Murphy, O'Rourke, and Greve in a conspiracy to "take Techmatic's customers, proprietary formulas, and other intellectual property, and ultimately destroy Techmatic's business, including its relationship with Pavco." (SAC ¶ 70.) In support of the existence of this conspiracy, Techmatic alleges that, on December 4, 2019, Greve began taking photographs of Techmatic's customer lines and sending the photographs to PSI, Brian Greene, and Schroer, at their request, through PSI's email system. In addition, Murphy, O'Rourke, and Greve, while still employed by Techmatic, began spreading "misinformation about the status and financial viability" of Techmatic to its customers and others in the industry. (SAC

¶ 72.) During the same time period and while still employed by Techmatic, O'Rourke and Greve visited Techmatic customers with PSI representatives, including Greene.

As a specific example, sometime in late 2019, Greve arranged for Greene to meet with a Techmatic customer to solicit business for PSI. Greve also participated in a conference call on January 24, 2020 between PSI, Greene, and the same customer. This call resulted in the customer's placing an order for certain equipment through PSI instead of through Techmatic, resulting in a substantial financial loss to Techmatic.

The SAC states that, in furtherance of the conspiracy, Schroer, Greene, and PSI conspired with Pavco, Greve, Murphy, and O'Rourke to "cause Pavco to terminate its relationship with Techmatic" and also conspired for "Greve, Pat Murphy, and O'Rourke to steal Techmatic's intellectual property and customer relationships and join PSI as employees." (SAC ¶ 75.)

While still employed by Techmatic in 2019, Murphy, Greve, and O'Rourke acted in furtherance of the conspiracy by encouraging Techmatic to develop distributor relationships with other chemical suppliers to serve the needs of their clients in order to create a pretext for Pavco to dissolve its distributorship relationship with Techmatic. They participated in site visits and discussions with the other suppliers to develop those relationships in furtherance of the conspiracy. They later transmitted to Pavco the details of these visits, which involved the collection and transmission of confidential trade secret information.

The SAC alleges that Greve, O'Rourke, and Murphy sent Techmatic's confidential proprietary information, including confidential customer information, to their personal email accounts and that they did so on PSI's and Greene's instruction, in furtherance of the conspiracy and in preparation to leave Techmatic.

Schroer, in furtherance of the conspiracy, falsely told several of Techmatic's suppliers that

Techmatic was going out of business, thus "set[ting] up" those suppliers to begin using PSI as a new distributor within Techmatic's "geographical sales area." (SAC ¶ 80.) In addition, Greve, O'Rourke, and Murphy "transmitted to Pavco additional confidential and trade secret information" "after Schroer's resignation in an effort to interfere with Techmatic's distributorship relationship with Pavco and Techmatic's supplier relationships with its customers." (SAC ¶ 81.)

On January 18, 2020, Pavco instructed Greve, O'Rourke, and Murphy not to attend Pavco's sales meeting on January 19. On January 19, 2020, Pavco notified Techmatic that it was terminating Techmatic as a distributor, effective immediately.

Techmatic asserts that, using "confidential contact information and trade secrets obtained from the individual defendants at Pavco's request," while Greve, O'Rourke, and Murphy were still employed by Techmatic, Pavco notified Techmatic's customers directly on January 20, 2020 that PSI would, going forward, be Pavco's exclusive distributor throughout the southeastern region and that Barry Schroer at PSI would be "the new point person for Pavco's products." (SAC ¶ 85.) PSI and Schroer allegedly assisted Pavco in revising the letter before it was disseminated. The letter also references an "enclosure from [PSI] regarding vendor set-up details." (Doc. No. 1-11.)

As evidence of the conspiracy, the plaintiff references emails and text messages exchanged between Greene and the individual defendants in January 2020, in which Greene solicited confidential information and trade secrets relating to Techmatic's sales volume, profit margins, and other sales data, and the defendants disclosed the confidential information requested by Greene before resigning from Techmatic. (SAC ¶¶ 90–96.) Greve, O'Rourke, and Murphy allegedly solicited business for PSI from Techmatic's customers while they were still employed by Techmatic; in addition, Murphy did so while he was still serving on Techmatic's Board of Directors. Murphy, O'Rourke, and Greve, allegedly in furtherance of the conspiracy, abruptly

resigned on January 26 and 27, 2020.

Techmatic alleges that its customers were not surprised by these departures, however, because "Murphy, O'Rourke, and Greve had previously informed numerous Techmatic customers that they would be leaving Techmatic and joining PSI, and successfully solicited Techmatic's customers to move their business to PSI immediately upon their departure." (SAC ¶ 97.) Several of Techmatic's customers moved their business to PSI, as a result of the individual defendants' solicitations and the "false reports of Techmatic's insolvency." (SAC ¶ 100.)

Techmatic alleges that, before they resigned, Greve, O'Rourke, and Murphy forwarded confidential emails, trade secrets, and confidential business information to their personal email addresses. In addition, Techmatic alleges that, although these defendants were reminded when they resigned that, upon their resignations, they were no longer authorized to access or use information on their Techmatic-issued computers, all three defendants copied the hard drives in their possession and retained the information on them, in cooperation with PSI, Greene, and/or Schroer, and then deleted all of the data on the computers before returning them to Techmatic. This data included Techmatic's confidential information and trade secrets, as well as "evidence of [the defendants'] and others' misconduct." (SAC ¶ 120.) Techmatic alleges that this confidential information was then transmitted to PSI and, "upon information and belief," to Pavco. (SAC ¶ 127.)

Techmatic asserts that Greve's, O'Rourke's, and Murphy's actions, both before they resigned from Techmatic and after they formalized their employment with PSI, violated their obligations under the Non-Compete and Confidentiality Agreements and constituted trade secret misappropriation. It also alleges that PSI, Greene, and "other co-conspirators" are continuing to use Techmatic's trade secrets, to Techmatic's disadvantage. (SAC ¶ 129.)

Techmatic asserts that, as of the date it filed the SAC in February 2022, it has suffered damages resulting from the defendants' actions in excess of $4,500,000, having suffered an 80% decrease in its sales and profits since February 1, 2020. (SAC ¶ 130.)

### F.    The Causes of Action

Based on these allegations, Techmatic asserts the following claims:

(1) civil RICO violation, under 18 U.S.C. § 1964(c) and (d), against all defendants;

(2) civil conspiracy, against all defendants;

(3) conspiracy in violation of the Sherman Act, 15 U.S.C. § 1, against PSI and Pavco;

(4) attempted monopolization and conspiracy to monopolize in violation of the Sherman Act, 15 U.S.C. § 2, against PSI and Pavco;

(5) breach of fiduciary duties, against Schroer, Murphy, O'Rourke, and Greve;

(6) breach of contract, against Schroer, Murphy, O'Rourke, and Greve;

(7) interference with contractual relationships, against PSI, Greene, and Schroer;

(8) interference with supplier relationship, against PSI, Greene, Schroer, Murphy, O'Rourke, and Greve;

(9) interference with customer relationships, against PSI, Pavco, Greene, Schroer, Murphy, O'Rourke, and Greve;

(10) violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, against PSI, Greene, Schroer, Murphy, O'Rourke, and Greve;

(11) violation of the Tennessee Uniform Trade Secrets Act, Tenn. Code Ann. § 47-25-1702, against PSI, Greene, Schroer, Murphy, O'Rourke, and Greve; and

(12) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4), against PSI, Greene, Schroer, Murphy, O'Rourke, and Greve.

(SAC, at 22–42.)

In their motion, the PSI defendants seek dismissal of all of the claims asserted against one or more of them *except* for Counts VI (breach of contract), X (violations of the Defend Trade Secrets Act violations), and XI (violations of the Tennessee Uniform Trade Secrets Act). In its

Motion to Dismiss, Pavco seeks dismissal of all five of the claims asserted against it (Counts I, II, III, IV, and IX).

## II.    STANDARD OF REVIEW

To survive the defendants' motions, the SAC must provide "a short and plain statement of the claim showing that [the plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2). When considering whether the SAC does so, the court accepts as true its factual allegations and draws all reasonable inferences in Techmatic's favor, but the court must disregard any legal conclusions. *Doe v. Baum*, 903 F.3d 575, 580–81 (6th Cir. 2018). The factual allegations will suffice if they "'plausibly suggest[]' that [Techmatic] can meet the elements of [its] claim[s]," *id.* at 580 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)), and allow the court "to draw the reasonable inference" that the defendants would be liable if Techmatic can prove its alleged facts, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III.    DISCUSSION

Both sets of defendants argue that the federal statutory claims must be dismissed under Rule 12(b)(6) for failure to state a claim for which relief may be granted and that the state common law claims against them are preempted by the Tennessee Uniform Trade Secrets Act. The court turns, first, to the federal statutory claims, before addressing the state common law claims.

### A.    The Federal Statutory Claims

#### 1.    *Count I: Civil RICO Violation*

The plaintiff brings claims against all defendants for alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). RICO makes it

> unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

18 U.S.C. § 1962(c). Section 1962(d) makes it unlawful for any person to conspire to engage in such conduct. Section 1964(a) creates a private civil cause of action for persons injured by a violation of § 1962 and entitles such persons to recover treble damages as well as costs and attorney's fees.[4] As other courts have recognized, RICO was enacted for the purpose of curtailing organized crime, but, since its inception, courts have labored to distinguish situations involving persons actually engaged in "longterm criminal activity" from those involving routine business disputes that do not include established patterns of racketeering activity. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242 (1989).

To state a claim under § 1962(c), a plaintiff must allege facts showing the "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). A failure to allege a substantive RICO violation under § 1962(c) will be fatal to a conspiracy claim under § 1962(d). *Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 805–06 (6th Cir. 2015).

As relevant here, "racketeering activity" is defined to include "any act indictable under" a wide number of federal criminal statutes, including 18 U.S.C. § 1832 (relating to theft of trade secrets). 18 U.S.C. § 1961(a). The defendants do not dispute that the SAC adequately alleges conduct by an "enterprise"—consisting of the alleged co-conspirators—that engaged in the theft of Techmatic's trade secrets. The issue raised in this case by both of the Motions to Dismiss is whether Techmatic has adequately pleaded the existence of a "pattern" of such activity. RICO defines "pattern" as requiring a minimum of two acts of racketeering activity within ten years of each other. 18 U.S.C. § 1961(5). However, "while two acts are necessary, they may not be

---

[4] The SAC characterizes the civil RICO claim as brought pursuant to "18 U.S.C. §§ 1964(c)–(d)." (SAC 22 (Count I).) The court presumes, based on context, that the plaintiff intended to refer to 18 U.S.C. § 1962(c)–(d).

sufficient." *H.J. Inc.*, 492 U.S. at 237 (quoting *Sedima*, 473 U.S. at 496 n.14). Rather, to establish a pattern, a plaintiff must show that the racketeering predicate acts are both "related" and that they "amount to or pose a threat of continued criminal activity." *Id.* at 239. "This is known as the 'relationship plus continuity' test." *Aces High Coal Sales, Inc. v. Cmty. Bank & Tr. of W. Ga.*, 768 F. App'x 446 (6th Cir. 2019) (citing *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 409 (6th Cir. 2012)). The relatedness and continuity components are typically analyzed separately, *H.J. Inc.*, 492 U.S. at 239, but the defendants' motions contest only the "continuity" component.

"'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241. As the Sixth Circuit has explained, open-ended continuity may be established where the predicate acts "involve a distinct threat of long-term racketeering activity" or "are part of an ongoing entity's regular way of doing business." *Aces High*, 768 F. App'x at 456 (internal quotation marks and citations omitted). Alternatively, "closed-period continuity" requires the showing of "a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *H.J. Inc.*, 492 U.S. at 242.

The defendants argue that the plaintiff fails to establish either form of continuity, because it has not plausibly alleged facts showing an ongoing scheme, that the predicate acts (primarily involving the alleged theft of trade secrets) constitute the "ongoing entity's regular way of doing business," *Aces High*, 768 F. App'x at 456, or that the alleged scheme extended over a "substantial period of time," *H.J. Inc.*, 492 U.S. at 242. The defendants characterize the alleged scheme as involving no threat of long-term racketeering activity and as extending, at most, a few months—

from the date of Greve's alleged corporate espionage on December 4, 2019, until February 12, 2020, the date the last individual defendant returned his computer to Techmatic.

The plaintiff, for its part, characterizes the alleged scheme as beginning with Schroer's alleged transmission of trade secrets while he was still employed by Techmatic in 2017 and "continuing through the present day with Pat Murphy, O'Rourke, and Greve's 'ret[ention of] copies of the confidential information and trade secrets found on their Techmatic-issued computers' that they stole, hid, and lied about keeping." (Doc. No. 100, at 3.) Techmatic also claims that its allegations show that the alleged predicate acts are "a part of Defendants' regular and ongoing way of doing business" and that its allegations establish *both* closed-ended and open-ended continuity. (*Id.* at 5; *see also* Doc. No. 96, at 16 (citing SAC ¶ 134(q)).) It also disputes the defendants' description of the alleged scheme as involving a single victim, a single type of injury, and a single type of predicate act occurring over no more than a few months. It insists, to the contrary, that the scheme involved more than one victim, because Techmatic's customers were also "injured through the loss of their trade secrets"; more harm than simply the loss of its confidential information, because Techmatic also lost the "honest services owed by" the individual defendants during their employment; "*more* types of predicate acts, including Pavco's interstate communications related to the theft of honest services, trade secrets, and other confidential information"; and more than merely a few months of duration, instead extending at least five years. (Doc. No. 100, at 6.)

a)      *Closed-Ended Continuity*

The Supreme Court has stated that closed-ended continuity is "centrally a temporal concept." *H.J. Inc.*, 492 U.S. at 242. Whether the predicate acts satisfy the continuity requirement depends on the particular facts of the case. *Id.*; *Moon v. Harrison Piping Supply*, 465 F.3d 719, 724 (6th Cir. 2006). As set forth above, a plaintiff may demonstrate continuity over a closed period

by "proving a series of related predicates extending over a substantial period of time." *H.J. Inc.*, 492 U.S. at 242. The Sixth Circuit has rejected the establishment of any "bright-line rule" or particular threshold length of time. *See Aces High*, 768 F. App'x 457 ("The district court concluded that this period, which 'endured for thirteen months at most,' was too short to satisfy this court's '17-month threshold.' Plaintiffs contend that there is no such bright-line rule, and plaintiffs are correct as far as that goes."). At the same time, the law is clear that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *H.J. Inc.*, 492 U.S. at 242.

Thus, in *Grubbs*, the Sixth Circuit affirmed the dismissal of the plaintiffs' civil RICO claim on the basis that the plaintiffs did not plausibly allege facts establishing closed-ended continuity, where the defendants' alleged scheme to steal Grubbs's business in its entirety, perpetrated while one of the defendants was still employed by plaintiff Grubbs, took place over the course of only eight months, and the plaintiffs did not allege facts showing a threat of future criminal conduct. The court characterized the event as a "short-term, terminable scheme[]" and held that "this single eight-month scheme" by the defendants to steal plaintiff Grubbs's business, the sole victim of which was Grubbs, could not "meet the standard for closed- or open-ended RICO liability." *Id.* at 805 (citing *Moon*, 465 F.3d at 725–26 (affirming the dismissal of a RICO complaint for lack of continuity, even assuming, as the plaintiff alleged, that the predicate acts occurred over two and one-half years, because the predicate acts were all "keyed" to a "single objective," with no other schemes, purposes, or injuries alleged, or facts suggesting the scheme would continue once the goal of depriving the plaintiff of his worker's compensation benefits was achieved); *Vemco, Inc. v. Camardella*, 23 F.3d 129, 134–35 (6th Cir. 1994) (holding that a single scheme in connection with a construction contract to build a single facility, involving a single victim and taking place

over seventeen months, lacked the requisite continuity); *Vild v. Visconsi*, 956 F.2d 560, 569–70 (6th Cir. 1992) (holding that the six- to seven-month duration of the alleged scheme involving a single victim was too brief to qualify for closed-ended continuity and did not qualify as open-ended, because it involved a breach of contract with a single customer)).

In *Aces High*, the Sixth Circuit reviewed all of these cases when it rejected the notion that it had ever adopted a bright-line rule and stated that, consistent with *H.J. Inc.*, courts are to determine whether closed-ended continuity is established by applying a "multi-factored approach that considers 'the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries.'" *Aces High*, at 457 (quoting *Columbia Nat. Res., Inc. v. Tatum*, 58 F.3d 1110 (6th Cir. 1995)); *see also Thompson v. Paasche*, 950 F.2d 306, 311 (6th Cir. 1991) (finding neither open-ended nor closed-ended continuity, stating: "Paasche's fraudulent scheme was an inherently short-term affair. He had nineteen lots to sell. Once he sold all of the lots, the scheme was over. It had to be, he had no more land to sell. Thus, his scheme was, by its very nature, insufficiently protracted to qualify as a RICO violation.").

In this case, although the plaintiff asserts that the RICO scheme began "[f]rom at least 2017" (SAC ¶ 134), it does not allege any concrete facts to support that assertion. The SAC alleges that Schroer began to "fail to meet" Techmatic's expectations in the "years prior" to his resignation, but it does not allege exactly when or how. (SAC ¶ 50.) The SAC alleges that Schroer resigned from Techmatic in May 2018 and that, during the "final months of his employment," he began engaging in activities that would "maximize the impact" of his misappropriation of trade secrets and confidential information and otherwise "disrupt" Techmatic's relationship with Pavco. (SAC ¶ 63.) But those allegations do not establish inappropriate conduct or actual theft of trade

secrets. The SAC implies that Schroer was in contact with PSI prior to his resignation, but it does not allege facts showing that he stole Techmatic's trade secret information and wrongfully conveyed it to PSI until after he resigned from Techmatic. (SAC ¶¶ 55–59.) Thus, it appears that the earliest date on which a predicate act of trade secret misappropriation actually occurred was the date of Schroer's resignation, May 14, 2018, or perhaps shortly before. The court, therefore, does not accept as true the plaintiff's unsupported assertion that Schroer's wrongful conduct began in 2017.

The actual facts alleged in the SAC that are deemed true for purposes of the defendants' motions are that the first predicate acts took place in May 2018 when Schroer defected from Techmatic and moved to PSI, taking trade secrets and confidential information with him, which PSI and Schroer later used to "damage Techmatic's business relationship with Pavco." (SAC ¶ 134(c).) The next predicate events are not alleged to have occurred until late 2019. Although the defendants argue in a footnote that the plaintiff fails to allege that Schroer's departure from Techmatic was related in any way to that of the other defendants, they rely on facts outside the SAC for that assertion. For purposes of the defendants' motions, the court accepts that these events are at least tangentially related, insofar as they involve Techmatic employees leaving Techmatic for PSI and allegedly taking trade secrets with them, for the purpose of damaging Techmatic's business relationships. The court nonetheless finds that, even assuming a starting date of May 2018, the SAC does not allege any other concrete event occurring between that date and late 2019, and the crux of the events giving rise to the plaintiff's RICO claim took place in a very concentrated time period, from late 2019 through February 2020.

Even using May 2018 as the starting date of the scheme, the court finds that the plaintiff has failed to allege facts establishing closed-ended continuity of a RICO scheme, because (1) the

predicate events consist primarily of a handful of concrete instances when the individual defendants allegedly stole and conveyed the plaintiff's trade secrets to PSI and Pavco and then deleted confidential information from Techmatic-issued computers in order to mask their wrongdoing; (2) the sole apparent objective of the scheme was to steal Techmatic's trade secrets in order to induce Techmatic's suppliers and customers to move their business to PSI; (3) Techmatic was the sole victim of the scheme; and (4) the duration of the scheme was, at most, twenty-two months. *Accord Moon*, 465 F.3d at 725–26 (finding no closed-ended continuity despite allegations that the scheme occurred over two and one-half years, where the predicate acts were all "keyed" to a "single objective").

b) *Open-Ended Continuity*

To state a RICO claim based on open-ended continuity, a plaintiff "must plausibly allege that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Heinrich*, 668 F.3d at 410. The Supreme Court, while not purporting to limit the concept, provided as an example of an archetypal open-ended scheme a situation in which a "hoodlum"

> sell[s] "insurance" to a neighborhood's storekeepers to cover them against breakage of their windows, telling his victims he would be reappearing each month to collect the "premium" that would continue their "coverage." Though the number of related predicates involved may be small and they may occur close together in time, the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future, and thus supply the requisite threat of continuity.

H.J. Inc., 492 U.S. at 242.

The Sixth Circuit found such open-ended continuity to exist in *United States v. Busacca*, 936 F.2d 232 (6th Cir. 1991), for example, where the defendant embezzled pension funds from his union six times within two and one-half months to pay his own legal fees in a prior RICO case. The court found that the defendant's disregard of the union's Board procedures, his "position of

control over the Union and the Funds, his secretive concealment and affirmative misrepresentations to the Board regarding the advanced monies, and his obvious attorney shopping for a legal opinion consistent with his objectives were sufficient to establish a threat of long term, continuing criminal activity," particularly given that the manner in which he embezzled funds was "capable of repetition indefinitely into the future," if he had not been caught and prosecuted. *Id.* at 238. Likewise, the adoption-fraud scheme alleged in *Heinrich v. Waiting Angels Adoption Services* showed a threat of continuity, because "there [was] no inherent limit to the number of couples seeking to adopt or to the number of children that the defendants could hold out as available for adoption." 668 F.3d at 411. And in *Kalitta Air, LLC v. GSBD & Associates*, 591 F. App'x 338 (6th Cir. 2014), the court held that dismissal of the plaintiff's RICO claim was not warranted, where the plaintiff alleged the existence of at least one other victim of a "very similar scheme" and numerous acts of fraud against the plaintiff that "could have continued indefinitely but for" the plaintiff's fortuitous discovery of the fraud, which led it to cancel the parties' contract. *Id.* at 345. The court found that these allegations were sufficient to establish open-ended continuity, because a jury could "plausibly infer that the scheme used against [the plaintiff and the other alleged victim] was the defendants' 'regular way of doing business' and could have continued indefinitely." *Id.* at 347.

In this case, however, the conspiracy allegedly began in May 2018, and it continued through February 12, 2020, the last date by which Murphy, O'Rourke, and Greve had resigned from Techmatic, had begun working for PSI, and had all copied the hard drives from their Techmatic computers before "wiping" them and returning them to Techmatic. (SAC 115.) The plaintiff asserts that the wrongful activity continues into the present, because Murphy, O'Rourke, and Greve have "admitted through counsel" that they had actually retained copies of the

computers' hard drives, and they still have not produced in this litigation all of the data that they allegedly misappropriated in 2020. (SAC ¶¶ 122–24.) Techmatic also alleges that the wrongful activity is ongoing, because "PSI, Greene, and the other co-conspirators continue to use this information as a part of their business and to the disadvantage of Techmatic." (SAC ¶ 129.) Finally, the plaintiff claims that "there is a continuing threat of repetition" of the defendants' "egregious wrongdoing," because the acts alleged in paragraph 134(a)–(q) of the SAC are "part of Defendants' regular way of conducting their ongoing metal finishing chemical business and thus the conspirators continue to act in support of their enterprise and conspiracy." (SAC ¶ 135.)

Despite Techmatic's very general allegations that there was a continuous and ongoing pattern of racketeering activity in this case, and despite the invocation of magic language asserting a threat of ongoing racketeering activity, the SAC does not go beyond labels and terms of art to include sufficient factual allegations of an ongoing scheme. First, the time frame of the alleged scheme is closed—it extends from no earlier than mid-May 2018 through February 2020, and it involves a single victim—Techmatic. Although Techmatic now claims that there are other "victims," it does not show that the other victims were victims of the same type of scheme as the one that allegedly affected Techmatic. Rather, the other "victims" were Techmatic's customers, who allegedly also lost trade secrets. (*see* Doc. No. 96, at 17; Doc. No. 100, at 6.) But the SAC contains no allegations showing how they lost their trade secrets, and it certainly does not allege that they suffered theft and misappropriation of trade secrets by their employees or former employees who then conspired to put them out of business.

Moreover, once Techmatic's employees stole Techmatic's trade secrets and went to work for PSI, the scheme was over. The plaintiff does not plausibly allege that PSI is going to continue to solicit Techmatic employees to breach their confidentiality agreements and go to work for PSI.

Nor do the factual allegations establish that this is PSI's (or Pavco's) ordinary way of doing business. Techmatic does not allege that there are other victims of similar schemes or that this scheme inherently could have gone on indefinitely if Techmatic had not discovered the wrongdoing. *Accord Thompson*, 950 F.2d at 311 (finding no threat of ongoing racketeering activity, because there was "no indication of any continuing opportunity or scheme to purchase or re-sell potentially oil-bearing land").

Finally, regarding Techmatic's allegation that the scheme is ongoing because the defendants are continuing to use and profit from Techmatic's trade secret information, the court finds that the predicate conduct was the theft of trade secrets. The fact that the plaintiff continues to incur injury related to that theft does not mean that the theft itself, or even the wrongful conduct, is ongoing. *Accord Grubbs*, 807 F.3d at 805 (rejecting the plaintiffs' argument that the defendants' "ends justify the means management style" (showing a "fail[ure] to respect the confidentiality of client lists") might "continue indefinitely into the future").

In sum, the allegations in the SAC do not plausibly allege facts that, if true, would establish open-ended continuity either, for purposes of RICO. Accordingly, the PSI defendants and Pavco are entitled to dismissal of the RICO claim under 18 U.S.C. § 1962(c). In addition, the dismissal of the § 1962(c) substantive claim is fatal to the conspiracy claim under § 1962(d), which will also be dismissed.

### 2. *Sherman Act Conspiracy, 15 U.S.C. § 1*

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. To establish a claim under § 1, the plaintiffs must first show the existence of an agreement between two or more economic entities to restrain trade. *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 270 (6th Cir. 2014). The plaintiffs must also show that the restraint is "undue" or

"unreasonable." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018) (citations omitted).

A constraint may be deemed unreasonable *per se*; if it is not unreasonable *per se*, it is judged under the so-called "rule of reason." *Id.* at 2283–84. The "*per se* rule is reserved for restraints that are so clearly unreasonable that their anticompetitive effects within geographic and product markets are inferred." *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 270 (6th Cir. 2014) (citation omitted). However, if the restraint is assessed under the rule of reason, plaintiffs must "show that the restraint produced anticompetitive effects within the relevant product and geographic markets." *Id.* Finally, in either case, the plaintiff must also establish that the illegal conspiracy caused it injury. *Id.*

Techmatic asserts a Sherman Act § 1 claim against PSI and Pavco. (SAC Count III.) It asserts that its factual allegations show that PSI and Pavco "conspired in restraint of trade to eliminate Techmatic" from the relevant markets, defined as the "product market(s) for custom chemical blending and distribution of metal-finishing products sold to metal-finishing companies in a multi-state geographic region including Tennessee, Kentucky, Arkansas, Mississippi, Alabama, Georgia, North Carolina, and South Carolina." (SAC ¶ 150.) Techmatic alleges that, in addition to selling Pavco products and products from other chemical producers, it also sold "Techmatic-blended specialty products." (SAC ¶ 151.) On this basis, it asserts that it was "*both* a direct purchaser/distributor from Pavco *and* a competitor of Pavco." (SAC § 151.) Similarly, it claims that PSI distributes Pavco products, other chemical producers' products, *and* its own "blended custom products to Pavco's end customers, making PSI a competitor of Pavco, as well." (SAC ¶ 152.)

Techmatic asserts that PSI and Pavco conspired to eliminate Techmatic from the "multi-state market for custom chemical blending and distribution of metal-finishing products" through

the termination of Pavco's distribution relationship with Techmatic, misappropriation of Techmatic's confidential custom blending formulas and other trade secrets and confidential information, the theft and destruction of information from its computer systems, and the "capture" of its key salespersons. (SAC ¶ 154.) It alleges that these actions threaten to put Techmatic out of business and have "eliminated the choice of suppliers that Techmatic's customers previously had, effectively forcing them to deal with PSI." (SAC ¶ 156.) Techmatic asserts that, by "conspiring to drive Techmatic out of business," Pavco and PSI now "effectively control the market for custom-blended metal finishing products, strengthening Pavco's upstream market power and giving PSI market power in the intra-brand market. (SAC ¶ 157.) It also claims there are impediments to the ability of other competitors to enter this market, because "customers cannot (or are unwilling to) immediately shift their commercial metal-finishing chemistries to use imperfect substitute goods." (SAC ¶ 157.) It asserts that Pavco's sudden refusal to deal with Techmatic, combined with the "coordinated theft" of its trade secrets, means that PSI is "effectively the sole distributor of Pavco products" in the geographic region described above and "the largest distributor of Pavco products in the nation." (SAC ¶ 158.) It claims that the conspiracy to eliminate Techmatic from the market has "injured competition by eliminating customer choice over alternative chemistries, blenders, and providers" and will likely result in increased prices for customers of these products. Based on its allegations that PSI and Pavco were its horizontal competitors, Techmatic asserts that the conspiracy should be deemed a *per se* restraint of trade in violation of § 1. But it also claims the conspiracy is unlawful under the rule of reason, since it had the purpose and effect of eliminating competition from the relevant market. (SAC ¶ 160.)

> a)    *The Parties' Arguments*

PSI characterizes the dispute here as a "run of the mill distributor termination case," in which one distributor was simply substituted for another, and that such a substitution does not

constitute an unreasonable restraint of trade. (Doc. No. 84, at 15 (citing *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 807 (6th Cir. 1988)).) It asserts that the plaintiff has failed to actually allege facts showing the existence of a horizontal restraint that would be subject to the *per se* rule and that, under the rule of reason, the § 1 claim is subject to dismissal because: (1) the plaintiff fails to allege anticompetitive effect at the interbrand level; (2) the plaintiff fails to identify the relevant market; and (3) the plaintiff fails to allege how the new distributorship agreement between PSI and Pavco adversely affects the market in a way that would be recognized as anticompetitive or that the agreement adversely affects consumers in any way.[5] Pavco echoes these arguments and adds that Techmatic has failed to adequately allege facts showing the existence of an agreement in the first place. (Doc. No. 91, at 12.)

In response, the plaintiff asserts that (1) its allegations of specific acts by the defendants "raise a 'suggestion' of [the existence of] such an agreement," which is sufficient at this juncture (Doc. No. 100, at 7 (quoting *Rudd v. City of Norton Shores*, 977 F.3d 503, 520 (6th Cir. 2020))); (2) it adequately alleges that, in addition to distributing Pavco products, it "competes with *both* PSI *and* Pavco in the market for metal finishing products," thus showing that PSI and Pavco are (or were) its horizontal competitors, as a result of which it has alleged facts supporting a *per se* § 1 violation (Doc. No. 86, at 19); and (3) even under a rule-of-reason analysis, its claim does not involve a simple "substitution of one distributor for another" but, rather, involves activity having anticompetitive effects at the interbrand level in clearly defined markets (Doc. No. 100, at 10).

---

[5] PSI also argues that Pavco terminated its distributorship agreement with Techmatic as a result of Techmatic's "failure and refusal to honor the exclusive nature of its distributorship relationship with Pavco." (Doc. No. 84, at 17–18.) This assertion directly conflicts with the allegations in the SAC that the proffered rationale was pretextual, as Pavco knew about and long tolerated Techmatic's distribution of other chemical producers' products, and it also allegedly allows PSI to sell other producers' products. The court, therefore, disregards this argument.

As set forth herein, the court finds that the SAC fails to allege a Sherman Act violation.

b) *The Existence of an Agreement*

*Bell Atlantic Corp. v. Twombly*, which is most commonly cited for having articulated the pleading standard applicable to Rule 12(b)(6) motions, directly involved the question of whether the plaintiffs adequately alleged the existence of an agreement or conspiracy in restraint of trade. As the court stated there:

> Because § 1 of the Sherman Act does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy, [t]he crucial question is whether the challenged anticompetitive conduct stem[s] from independent decision or from an agreement, tacit or express.

*Twombly*, 550 U.S. 544, 554 (2007) (internal quotation marks and citations omitted; alterations in original). The court then applied the general pleading standard to the claim and concluded that, to state a colorable claim under § 1, the complaint must allege "enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556. At the same time, however, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice."

In this case, the allegations regarding Pavco are particularly thin and are not sufficient to suggest the existence of an agreement, as opposed to merely parallel conduct. The SAC clearly alleges that PSI, through the individual defendants, engaged in overt acts, including (among other things) the misappropriation of trade secrets; the spreading of misinformation about Techmatic's status and financial viability in order to shift business to PSI; and visiting Techmatic customers with PSI representatives in order to solicit business for PSI and away from Techmatic. (SAC ¶¶ 71–74.) The only allegations concerning Pavco's involvement, however, are that it (1) notified Murphy, Greve, and O'Rourke not to attend the Pavco sales meeting on January 19, 2020; (2) notified Techmatic on January 20, 2020 that it was terminating their distributorship relationship effective immediately; and (3) transitioned Techmatic's customers to PSI, allegedly using

confidential contact information obtained from the PSI defendants. (SAC ¶¶ 92–84.) More specifically, Pavco notified Techmatic's customers by a letter dated January 20, 2020 that PSI was now its exclusive distributor in the region and that Pavco's products could be purchased through Schroer at PSI. (SAC ¶ 85.) Schroer and PSI allegedly assisted in drafting that letter, and the list of Techmatic customers to which the letter was sent was developed through customer lists provided to Pavco and PSI by Schroer, Murphy, O'Rourke, and Greve. (SAC ¶¶ 82–88.)

Notably, however, the SAC does not purport to assert a trade secret misappropriation claim, under federal or state law, against Pavco, and there are no allegations that Pavco was actually aware of—or had reason to know about—the PSI defendants' intention to drive Techmatic out of business entirely. While Pavco allegedly passively received some confidential customer information (sufficient, at least, to permit it to notify Techmatic's former customers that they should, going forward, buy Pavco products through PSI[6]) and worked with PSI to draft the termination letter, these allegations alone are not sufficient to establish the existence of actual agreement, much less an agreement in restraint of trade.

c)      *Allegations in Support of a Per Se Sherman Act Violation*

The conclusion that the plaintiff fails to adequately allege an agreement warrants dismissal of the Sherman Act claim. However, even if the court presumes the existence of such an agreement, the claim still fails, as the plaintiff's allegations, accepted as true, do not support a *per se* Sherman Act violation or a restraint that fails the rule of reason.

The *per se* rule is "invoked when surrounding circumstances make the likelihood of

---

[6] Logically, it seems likely that Pavco already possessed that information, since Techmatic's customers were also its customers. For purposes of the defendants' motions, however, the court accepts as true the SAC's allegations (or implication) that it obtained that information from Murphy, O'Rourke, and/or Greve.

anticompetitive conduct so great as to render unjustified further examination of the challenged conduct." *Expert Masonry, Inc. v. Boone Cty.*, 440 F.3d 336, 342 (6th Cir. 2006) (quoting *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*, 468 U.S. 85, 103–04 (1984)). "Except where courts have already carved out certain categories of offenses as proscribed *per se*, '[t]here is an automatic presumption in favor of the rule of reason standard.'" *Id.* (quoting *Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1012 (6th Cir .2005)).

The Sixth Circuit has observed that there are "two major types of antitrust conspiracies to restrain trade: horizontal and vertical." *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 805 (6th Cir. 1988). "Horizontal conspiracies involve agreements among competitors at the same level of competition to restrain trade," while vertical conspiracies "involve agreements between competitors at different levels of competition to restrain trade, such as agreements between a manufacturer and its distributors to exclude another distributor from a given product and geographic market." *Id.* "[A]ll vertical price restraints are to be judged under the rule-of-reason standard." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 435 (6th Cir. 2008) However, "[u]nder Section 1 of the Sherman Act, *certain* horizontal agreements are viewed as especially injurious" and, therefore, are barred *per se*. *Expert Masonry*, 440 F.3d at 344 (emphasis added). "These principally include price-fixing, bid-rigging,[7] market

---

[7] "Bid rigging" "refers to horizontal price fixing whereby two or more suppliers (or occasionally purchasers) secretly fix the price at which they will bid." *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 62 (1st Cir. 2004) (citing *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 777 (7th Cir. 1999), *cited in Expert Masonry*, 440 F.3d at 344.

allocation,[8] group boycotts,[9] and certain tying arrangements[10][.]" *Id.* at 344 (internal citations omitted). "Whether a plaintiff's alleged facts comprise a *per se* claim is normally a question of legal characterization that can often be resolved by the judge on a motion to dismiss or for summary judgment." *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 61 (1st Cir. 2004) (finding that the alleged horizontal agreements were not "exclusionary or anti-competitive" on their face and, therefore, were not subject to the *per se* rule); *see also Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 297 (1985) (recognizing that not all horizontal restraints are subject to the *per se* rule).

In this case, the SAC baldly alleges that, "[g]iven that Pavco and PSI were horizontal competitors of Techmatic for the sale of metal-finishing chemicals for end users," their conspiracy to eliminate Techmatic from the relevant] markets "should be deemed a *per se* violation of Section 1 of the Sherman Act." (SAC ¶ 160.) However, even if the court accepts as true that the plaintiff, Pavco, and PSI are horizontal competitors, Techmatic does not allege the type of agreement among horizontal competitors that is subject to the *per se* rule. It does not, that is, remotely allege facts

---

[8] As the Supreme Court has explained, "[o]ne of the classic examples of a *per se* violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972), *quoted in United States v. Coop. Theatres of Ohio, Inc.*, 845 F.2d 1367, 1371 (6th Cir. 1988).

[9] *See U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 593 (1st Cir. 1993) (explaining that the designation of "group boycott," for purposes of the *per se* rule, "is principally reserved for cases in which competitors agree with each other not to deal with a supplier or distributor if it continues to serve a competitor whom they seek to injure").

[10] A tying arrangement is defined "as an agreement by a party to sell one product . . . only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Mich. Div.-Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 732 (6th Cir. 2008) (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958)). The Supreme Court has held that, "in all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 46 (2006).

suggesting an agreement regarding price-fixing or market allocation, nor does it allege bid-rigging, a group boycott, or any kind of tying arrangement. Instead, it alleges that Pavco and PSI conspired to steal its trade secrets and its customers, thus substantially reducing its business and business opportunities and that, having obtained "total control over the market," they "can and would" raise prices. (SAC ¶ 159.) Thus, the question of whether Pavco and PSI's actions could be deemed to violate the Sherman Act would be subject to the rule of reason and a determination of whether they actually have anticompetitive effects.

### d) The Rule of Reason

As an initial matter, insofar as Techmatic's Sherman Act § 1 claim is premised upon Pavco's terminating it and substituting PSI as its distributor within the geographic region formerly occupied by Techmatic, the Sixth Circuit has repeatedly held that this type of action does not violate the Sherman Act unless the plaintiff adequately alleges "anticompetitive effect at the *interbrand* level," as opposed to merely at the *intrabrand* level.[11] *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 806 (6th Cir. 1988) (emphasis added).

The plaintiff does not actually dispute that proposition. Instead, it argues that it does not merely allege that Pavco substituted one distributor for another. (Doc. No. 100, at 10.) Instead, it argues, the SAC alleges facts showing that "Pavco and PSI coordinated corporate espionage and refusal to deal in order to drive Techmatic out of the market for chemical blending and the sale of metal finishing products" altogether, "both as a distributor and a blender." (*Id.*) The court finds

---

[11] "Interbrand competition is the competition among the manufacturers of the same generic product . . . and is the primary concern of antitrust law." *Crane & Shovel*, 854 F.2d at 806 (referencing television sets as an example of such a "generic product"). "[I]ntrabrand competition is the competition between the distributors—wholesale or retail—of the product of a particular manufacturer." *Id.* Thus, for example, to the extent that both Techmatic and PSI sold Pavco products within the same geographic region, they were intrabrand competitors.

that, as a result of these allegations, Techmatic's § 1 claim does not fall squarely within the scope of *Crane & Shovel* and similar cases holding that "it is simply not an antitrust violation for a manufacturer to contract with a new distributor, even if the effect of the new contract is to seriously damage the former distributor's business." *Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc.*, 691 F.2d 241, 243 (6th Cir. 1982) (quoting *Burdett v. Altec Corp.*, 515 F.2d 1245, 1249 (5th Cir. 1975)). The court, accordingly, must apply the rule of reason test to these allegations.

"The starting point in a rule of reason case is to identify the relevant product and geographic markets." *Stratmore v. Goodbody*, 866 F.2d 189, 194 (6th Cir. 1989). The relevant product market means the line of goods or services reasonably interchangeable in use. *United States v. E.I. DuPont DeNemours & Co.*, 351 U.S. 377, 404 (1954). The relevant geographic market means the "area in which the seller operates, and to which the purchaser can practically turn for supplies." *Tampa Elec. Co. v. Nat'l Coal Co.*, 365 U.S. 320, 327 (1961).

Market definition is the threshold issue because "[w]ithout a definition of that market there is no way to measure" a defendant's market power in the relevant product market. *Walker Process Equip., Inc. v. Ford Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965). In the absence of market power in the relevant market, a company "cannot have an adverse effect on competition." *Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc.*, 243 F.3d 980, 988 (6th Cir. 2001) (citation omitted). And the "essence of the Section 1 Rule of Reason analysis is whether the challenged agreement is one that promotes competition or one that suppresses competition." *White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 505 (6th Cir. 1983) (internal quotation marks and citation omitted).

The Sixth Circuit has explained that:

> The essential test for ascertaining the relevant product market involves the identification of those products or services that are either (1) identical to or (2) available substitutes for the defendant's product or service. . . . [R]easonable interchangeability may be gauged by (1) the product uses, *i.e.*, whether the

substitute products or services can perform the same function, and/or (2) consumer response (cross-elasticity), that is, consumer sensitivity to price levels at which they elect substitutes for the defendant's product or service.

*Id.* at 500 (citations omitted).

The plaintiff defines the relevant markets in this case as follows:

the product market(s) for custom chemical blending and distribution of metal-finishing products sold to metal-finishing companies in a multistate geographic market including Tennessee, Kentucky, Arkansas, Mississippi, Alabama, Georgia, North Carolina, and South Carolina.

(SAC ¶ 150; *see id.* ¶ 42 (defining the geographic area in which Techmatic was authorized to distribute Pavco products beginning in November 1988); *id.* ¶ 154 (referencing the "multi-state market for custom chemical blending and distribution of metal-finishing products").) Regarding the anticompetitive effects of the defendants' actions, Techmatic alleges that, aside from threatening its ability to continue to operate as a going concern, the defendants' "clandestine theft and use of Techmatic's confidential information about its blended products and its customers' chemical processes and specific needs" "has eliminated the choice of suppliers that Techmatic's customers previously had, effectively forcing them to deal with PSI." (SAC ¶ 156.) It alleges that, "[b]y conspiring to drive Techmatic out of business and eliminate it from the market, Pavco and PSI now effectively control the market for custom-blended metal finishing products" (SAC ¶ 157) and, because they have "total control over the market, Pavco and PSI can and would increase prices to end customers for these products" (SAC ¶ 159.)[12] The plaintiff also alleges that "[t]here is no reasonable prospect of new entrants or other market participants offering customers a meaningful

---

[12] The court, for purposes of this analysis, disregards the plaintiff's allegations regarding the absence of intrabrand competition resulting from its termination as a distributor of Pavco products—that is, the allegations that PSI is now Pavco's exclusive distributor in what was the region occupied by Techmatic. As set forth above, the Sherman Act is not concerned with this type of injury.

alternative choice of sellers, because customers cannot (or are unwilling to) immediately shift their commercial metal-finishing chemistries to use imperfect substitute goods." (SAC ¶ 157.)

These allegations, however, are somewhat at odds with the plaintiff's allegations that it "sourced and continues to source metal finishing chemicals from a variety of suppliers" (SAC ¶ 39) and its statement in its letter to its customers, upon being terminated as a Pavco distributor, that it would "continue to provide products and services for your metal finishing needs, including specification requirements" (Doc. No. 88 & Ex. K, Doc. No. 18-11, at 2). In other words, although the plaintiff complains about being terminated by Pavco and the theft of its trade secrets, it has not explained why, as a practical matter, it cannot continue to supply its customers within the identified geographic region with other producers' products as well as with its own chemical blends— particularly given its allegations that customers are generally unwilling to shift to substitute goods. In fact, its allegations suggest that competition in the custom-blend market has actually been increased by the introduction of PSI into Techmatic's geographic region (albeit because PSI can now also attempt to replicate the plaintiff's custom blends).

In addition, however, the court further notes that, even though the plaintiff states that it "sourced and continues to source metal finishing chemicals from a variety of suppliers" (SAC ¶ 39), its allegations, broadly interpreted, may also be construed to mean that the defendants' actions have effectively put it out of business, as a result of which only PSI has effectively displaced Techmatic and now occupies a geographic and product market that used to be occupied by Techmatic. Even if the court construes the SAC thus, however, Techmatic has not alleged that it and PSI ever actually competed in the same geographic market to sell Pavco products—or their own custom-blended products or other companies' products—except in Kentucky, in a "portion" of which they both allegedly distributed Pavco products. (*See* SAC ¶¶ 41, 42.) As a result, it seems

that Techmatic's removal (or potential removal) from the market for custom-blended products in the geographic "market" it identifies would mean only that PSI has been (or will be) substituted for Techmatic in that market, leaving the same number of competitors to occupy that region. The plaintiff, therefore, has not adequately alleged how its removal from the relevant product and geographic markets reduces competition within those markets. *Accord Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 823 (6th Cir. 1982) ("Anticompetitive conduct is conduct designed to destroy competition, not just to eliminate a competitor.").

Moreover, Techmatic's definition of the product market (the "custom chemical blending and distribution of metal-finishing products sold to metal-finishing companies") is entirely conclusory, lacking details about the other competitors in the market, specifically relating to the availability of substitutes for the defendants' products. *Accord, e.g.*, *Varsity Brands, Inc. v. Star Athletica, L.L.C.*, No. 2:10-cv-02508-BBD-cgc, 2011 WL 13097063, at *4, 5 (W.D. Tenn. Oct. 31, 2011) (finding the plaintiff's market definition—"the market for cheerleader clothing and related accessories that are sold primarily to schools with sports teams such as public schools, middle schools, high schools, colleges and universities, professional and semiprofessional sports teams, and sports clubs and organizations within the United States"—to be insufficient, because the plaintiff "fail[ed] to identify the products that are identical to or available substitutes for [the defendant's] products"); *Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 970–71 (W.D. Tenn. 2004) (granting motion to dismiss Sherman Act claims based on the plaintiff's failure to adequately define the relevant markets, where it "refer[red] to the relevant product market as 'exclusive salon hair care products . . . those sold exclusively through salons under the advice of professional hair stylists'" but "offered no allegation of which hair care product brands are interchangeable with Defendants' products").

The court finds, in short, that the plaintiff has not adequately pleaded a violation of § 1 of the Sherman Act under the rule of reason. Its definition of the product market is insufficiently specific and, even assuming it has adequately defined that market, it has not alleged facts—as opposed to conclusory statements of law—showing that the defendants' actions have had an anticompetitive effect—that is, that they have harmed anyone other than Techmatic.

### 3. Sherman Act Attempted Monopolization and Conspiracy to Monopolize, 15 U.S.C. § 2

Section 2 of the Sherman Act prohibits monopolization and the attempt to monopolize. 15 U.S.C. § 2. To prove monopolization, a plaintiff must show both "(1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). For an attempted monopolization claim, a plaintiff must show: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc v. McQuillan*, 506 U.S. 447, 456 (1993). "In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Id.* Thus, for both a monopolization claim and an attempt-to-monopolize claim under § 2, the plaintiff's "first step [is] to define the relevant product and geographic markets in which it competes with the alleged monopolizer, and with respect to [a] monopolization claim, to show that the defendant, in fact, possesses monopoly power." *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 782 (6th Cir. 2002).

The plaintiff in this case has failed to do so. As set forth above, it has failed to adequately define the relevant markets or show that the defendants' actions have an anticompetitive effect.

These failures are also fatal to the § 2 claims. *See Spectrum Sports*, 506 U.S. at 459 ("[D]emonstrating the dangerous probability of monopolization in an attempt case also requires inquiry into the relevant product and geographic market."); *Superior Prod. P'ship v. Gordon Auto Body Parts Co.*, 784 F.3d 311, 318 (6th Cir. 2015) ("Conspiracy to monopolize . . . requires an initial identification of the relevant markets.").

Moreover, the plaintiff also fails to adequately allege either that Pavco actually possesses monopoly power in the relevant markets or a dangerous probability of achieving monopoly power. Techmatic asserts that "Pavco has strengthened its market power in the interbrand market by eliminating Techmatic . . . as a horizontal competitor" (SAC ¶ 165), but this conclusory allegation is not plausible, in particular because, as indicated above, Techmatic does not allege that it cannot continue to sell its own products and other manufacturers' competing brands.[13] Likewise, Techmatic asserts "upon information and belief" that Pavco's "share of the market for metal finishing products exceeds 50% and that its market share is likely to increase."(SAC ¶ 164.) These wholly conclusory allegations are not sufficient to establish Pavco's market share for purposes of showing monopoly power or potential monopoly power. *Accord F.T.C. v. Facebook, Inc.*, 560 F. Supp. 3d 1, 18 (D.D.C. 2021) (finding the F.T.C.'s "bare assertions" that Facebook had a share in the "U.S. personal social networking market" in excess of 60% "too conclusory to plausibly establish market power in any context"); *see id* (collecting cases standing for the same principle, including: *EuroTec Vertical Flight Sols., LLC. v. Safran Helicopter Engines S.A.A.*, No. 15-3454, 2019 WL 3503240, at *3 (N.D. Tex. Aug. 1, 2019) (noting that bare allegation of "market share

---

[13] Notably, Techmatic alleges that its sales and profits have decreased by 80% since February 1, 2020 (SAC ¶ 130), but it does not indicate how much of that decrease is due solely to its loss of its ability to distribute Pavco products and how much, if any, is attributable to a decrease in the sales of its own proprietary products and those of other manufacturers.

of over 50 percent" was "conclusory"); *Synthes, Inc. v. Emerge Med., Inc.*, No. 11-1566, 2012 WL 4473228, at *11 (E.D. Pa. Sept. 28, 2012) (allegation that defendant "is a monopoly . . . with over 50% market share" was a "threadbare recital unsupported by factual allegations [that] the Court need not accept . . . as true"); *Syncsort Inc. v. Sequential Software, Inc.*, 50 F. Supp. 2d 318, 330 (D.N.J. 1999) ("Here, [plaintiff] recited in conclusory fashion that [defendant] 'controls the majority of the [relevant] market.' . . . [T]his single statement of market power in the pleadings . . . is an insufficient allegation of the possession of monopoly power.")).

In the absence of an adequately defined product market, anticompetitive activity, or plausible allegations that Pavco had a monopoly or the potential to develop a monopoly in the relevant market, the plaintiff's Sherman Act § 2 claim is also subject to dismissal.

### 4. *Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030*

Count XII of the SAC asserts that the PSI defendants violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030. The CFAA is primarily a criminal statute, but it also authorizes "[a]ny person who suffers damage or loss by reason of a violation of this section [to] maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).

Techmatic asserts that the PSI defendants violated 18 U.S.C. § 1030(a)(2)(C), which prohibits 'intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] . . . information from any protected computer"; Section (a)(4), which prohibits knowingly and with intent to defraud accessing a protected computer without authorization, or exceeding authorized access, and "by means of such conduct further[ing] the intended fraud and obtaining anything of value"; and Section (a)(5)(A), which provides for liability on the part of any person who "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization,

to a protected computer." In other words, CFAA claims fall into two categories: "access" claims and "transmission" claims. *See Wachter, Inc. v. Cabling Innovations, LLC*, 387 F. Supp. 3d 830, 836 (M.D. Tenn. 2019) (Richardson, J.) Both types of claims require that the persons who access or transmit the data do so without authorization. *Id.* (citing *ReMedPar, Inc. v. AllParts Med., LLC*, 683 F. Supp. 2d 605, 609 (M.D. Tenn. 2010) (Wiseman, S.J.)).

Regarding such authorization, Techmatic asserts that Murphy, O'Rourke, and Greve, both "[w]hile still employed by Techmatic" and after their resignations were effective, accessed Techmatic's protected computers either without authorization or in excess of their authorization, to obtain and misappropriate sensitive and confidential business information. (SAC ¶¶ 225–28.) Techmatic further alleges that these defendants violated the CFAA when they "misappropriated Techmatic's trade secrets before and after their authorization expired and was revoked by their resignations by making copies of the hard drives of their Techmatic-issued work computers" and continuing to access that information after their resignations were effective. (SAC ¶¶ 229, 231.) The plaintiff further alleges that Murphy, O'Rourke, and Greve, after resigning and before returning the laptops to Techmatic, "knowingly transmitted a program, code, or command to permanently and irretrievably delete confidential business data and other valuable data from Techmatic's protected computers without authorization." (SAC ¶ 234.) Such data allegedly included "information about Defendants' legitimate conduct as Techmatic employees and their unlawful conduct as co-conspirators that is not otherwise available to Techmatic." (SAC ¶ 239.) Finally, Techmatic alleges that Murphy, O'Rourke, and Greve committed these acts "with the encouragement and/or assistance of PSI, Greene, and Schroer." (SAC ¶ 225)

The PSI defendants argue generally that the CFAA claim must be dismissed because (1) the plaintiff's allegations fail to establish that the defendants were not authorized to access their

Techmatic-issued computers or that they exceeded authorized access to their laptop computers; and (2) the allegations that the defendants deleted information from their laptops does not constitute the type of damages contemplated by a "transmission" claim under the CFAA.

a)    *"Authorized" Access*

To establish an "access" claim or a "transmission" claim under the CFAA, the plaintiff must establish that the defendants accessed a "protected computer"[14] either "without authorization" or in a manner that "exceeds authorized access." 18 U.S.C.A. § 1030(a)(2), (4), (5). The Supreme Court has recently confirmed that the statute "does not cover those who . . . have improper motives for obtaining information that is otherwise available to them." *Van Buren v. United States*, 141 S. Ct. 1648, 1652 (2021). Even before that decision, courts within the Sixth Circuit were unanimous in holding that an employee who is authorized to access his work computer does so for an unauthorized purpose—such as to steal trade secrets and transmit them to his new employer while he is still employed by the defendant—cannot be liable under the CFAA. *See, e.g.*, *Skywatcher, LLC v. Oliver*, No. 1:19-CV-409, 2020 WL 4904170, at *2 (W.D. Mich. Aug. 20, 2020) ("[A] majority of district courts within the Circuit have concluded that the CFAA must be interpreted narrowly so as to preclude civil liability where an employee merely misuses or misappropriates information to which he was permitted access."); *Wachter*, 387 F. Supp. 3d at 837 ("[T]he weight of authority appears to be that there cannot be a CFAA violation where an employee has lawful access to his computer.").

On the other hand, courts are also in accord that a former employee who continues to access his former employer's computer system *after he is no longer employed* does so without the

---

[14] A "protected computer" is defined as any computer "used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2)(B).

requisite authority. *See, e.g.*, *Viera v. Gen. Auto. Ins. Servs.*, No. 3:19-CV-00901, 2021 WL 396687, at *18 (M.D. Tenn. Feb. 4, 2021) (Richardson, J.) (distinguishing *Wachter* and finding that an employee who was no longer employed lost whatever authority to access the employer's computer systems she had while employed (citing *United States v. Steele*, 595 F. App'x 208, 211 (4th Cir. 2014) ("[T]he fact that [Defendant] no longer worked for [the company] when he accessed its server logically suggests that the authorization he enjoyed during his employment no longer existed."))).

Thus, to the extent the plaintiff's CFAA claims are premised upon the defendants' accessing their Techmatic-issued laptop computers for unauthorized purposes while they were still employed, the claims are legally invalid, because such access was not unauthorized. On the other hand, to the extent the claims are premised upon allegations that the defendants continued to access the laptop computers *after* their employment terminated, the CFAA claim is not subject to dismissal, as the plaintiff plausibly alleges that the defendants' authorization to access the Techmatic computers terminated upon the effective date of their resignations.

The defendants argue simply that their "provision . . . of notices of resignation [did] not terminate their employment relationships" and that they continued to have access to their computers "until the date on which the employment of the individual Defendants terminated and they returned the laptop computers." (Doc. No. 84, at 24.) The plaintiff alleges that Murphy gave notice of resignation on January 26, 2020, that his resignation was effective January 27, and that he returned his laptop, wiped clean, the same day. (SAC ¶¶ 96, 112.) Greve allegedly gave notice and resigned effective January 26, 2020, but he did not return his laptop until February 7. (SAC ¶¶ 94, 114.) O'Rourke allegedly gave notice and resigned on January 27, 2020 but did not return his laptop until February 12, 2020. (SAC ¶¶ 95, 115.) Even with respect to Murphy, however, there

exists a question of fact as to whether he accessed his computer after his resignation became effective on January 27, 2020 and, therefore, after his authorization terminated. Greve and O'Rourke clearly had time to continue to access their computers without authorization between the dates their resignations became effective and the dates they actually returned their Techmatic-issued computers.

The defendants also argue that, in any event, they continued to have authority to access personal information maintained on their work-issued computers, including such things as family photos, tax records, health and medical information, and attorney communications. (Doc. No. 84, at 24.) While that assertion is debatable, the plaintiff does not base its claim on the defendants' access to such personal information, nor does Techmatic allege that it suffered injury relating to the defendants' access of that type of information. This argument, therefore, is beside the point. The point is that the SAC adequately alleges that Murphy, Greve, and O'Rourke accessed protected information on their computers after their resignations went into effect and, therefore, after their authorization to access their computers terminated, for purposes of their CFAA "access" and "transmission" claims.

b) *"Access" by PSI, Greene, and Schroer*

Techmatic also argues that while Murphy, Greve, and O'Rourke directly accessed the Techmatic laptops without authorization after their employment terminated, "PSI, Greene, and Schroer accessed Techmatic's systems—entirely without authorization—using Pat Murphy, O'Rourke, and Greve as their agents." (Doc. No. 96, at 6 (citing SAC ¶ 227[15]).) Techmatic asserts

---

[15] Paragraph 227 actually asserts as follows:

O'Rourke, Greve, and Pat Murphy, with the encouragement and/or assistance of PSI, Greene, and Schroer, intentionally accessed Techmatic's protected computers without authorization—which had expired and been revoked upon their

that a defendant who "'used the plaintiff's employee as its agent while the employee was still employed with the plaintiff . . . can be liable under the CFAA' even if the disloyal employees are authorized to access the systems." (Doc. No. 96, at 6 (quoting *Wachter*, 387 F. Supp. 3d at 839 n.4).)

Judge Richardson, in *Wachter*, did not make such an affirmative statement as the plaintiff represents. Rather, a footnote in *Wachter* observes that an argument could be made that a defendant entity "that allegedly used the plaintiff's employee as its agent while the employee was still employed with the plaintiff [could] be liable under the CFAA, even if its agent personally avoids liability because he or she did not exceed his or her authorized access." 387 F. Supp. 3d at 389 n.4. The plaintiff in that case did not develop that argument, however, and the court further noted that it had not found any authority to support that type of claim. As a result, the CFAA claim was dismissed as to the entity defendant. *Id.*

In this case, the SAC clearly asserts a CFAA claim against all of the PSI defendants, but the PSI defendants have addressed only the question of Murphy's, O'Rourke's, and Greve's authorization to access their computers, without specifically moving to dismiss the access claim against PSI, Greene, and Schroer. Although the court has doubts as to the viability of the claim against the latter three defendants, the claim will stand for now, simply because the defendants have not moved to dismiss it.

<em>c)     Transmission Claim</em>

The PSI defendants argue that the SAC fails to state a colorable CFAA transmission claim, because it has not alleged cognizable damages under the CFAA in the form of "impairment to the

_____

resignations—to obtain emails, customer information, trade secrets, and other sensitive business information in violation of 18 U.S.C. § 1030(a)(2)(C).

integrity or availability of data, a program, a system or information." (Doc. No. 84, at 26 (quoting *Pulte Homes, Inc. v. Laborers' Int' Union of N. Am.*, 648 F.3d 295, 301 (6th Cir. 2011)). They assert that the alleged transmission of protected information to a competitor may give rise to a claim for trade secret misappropriation or breach of contract, but not a claim under the CFAA. In a footnote, the defendants contend that the mere deletion of files does not constitute properly pleaded damages under the CFAA unless the plaintiff also pleads that "original" and irretrievable information was deleted. (Doc. No. 84, at 23 n.15.)

Techmatic argues in response that it has properly alleged damages arising from unauthorized transmission by alleging the "permanent and irretrievable deletion of Techmatic's files" from the defendants' Techmatic-issued laptops, including files necessary to establish the defendants' wrongdoing.

Under the CFAA, "any impairment to the integrity or availability of data, a program, a system, or information" qualifies as "damage." 18 U.S.C. § 1030(e)(8). The Sixth Circuit has held, based on the plain language of the statute, that "a transmission that . . . diminishes a plaintiff's ability to use data or a system—causes damage." *Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*, 648 F.3d 295, 301 (6th Cir. 2011). The Seventh Circuit has expressly held that a defendant's act of loading onto a computer a program designed to permanently delete computer files, including data "that would have revealed to [the plaintiff] improper conduct in which [the defendant] engaged," effects the kind of damage covered by § 1030(e)(8) and constitutes a violation of 18 U.S.C. § 1030(a)(5)(A). *Int'l Airport Ctrs., L.L.C. v. Citrin*, 440 F.3d 418 (7th Cir. 2006), *abrogated on other grounds by Van Buren v. United States*, 141 S. Ct. 1648 (2021); *accord Dana Ltd. v. Am. Axle & Mfg. Holdings, Inc.*, No. 1:10-CV-450, 2012 WL 2524008, at *5 (W.D. Mich. June 29, 2012) ("[T]he unauthorized deletion of original files that damaged [the plaintiff] would

undoubtedly fall within the scope of the CFAA." (citing *Cheney v. IPD Analytics, L.L.C.*, No. 08-23188-CIV, 2009 WL 3806171, at *6 (S.D. Fla. Aug. 20, 2009) (noting that permanent deletion of files from a laptop computer without authorization may constitute "damage" under CFAA but that deletion of files alone does not constitute damage if the deleted data is still available to the plaintiff through other means)).

In this case, the SAC alleges that Murphy, Greve, and O'Rourke "wiped clean" their Techmatic-issued laptops before returning them to Techmatic. (SAC ¶¶ 112, 118.) It alleges that the individual defendants did not merely press the "delete" button but, instead, used some type of program to permanently delete original files—including files and documents that would have provided evidence of the defendants' wrongdoing—to which Techmatic does not otherwise have access. (*See* SAC ¶¶ 234, 239–40.) These allegations are sufficient at this juncture to state a "transmission" claim under the CFAA.

In sum, the PSI defendants' Motion to Dismiss will be denied, insofar as they seek dismissal of the CFAA claims in their entirety.

### B. The Common Law Claims

The Tennessee Uniform Trade Secrets Act ("TUTSA"), Tenn. Code Ann. §§ 47-25-1701 through -1709, was adopted in 2000 to establish a comprehensive statutory scheme to govern the definition of trade secrets and to protect against their misappropriation. *Hauck Mfg. Co. v. Astec Indus., Inc.*, 375 F. Supp. 2d 649, 654 (E.D. Tenn. 2004). It provides various remedies for trade secret misappropriation, including injunctive relief, money damages, exemplary damages, and attorney's fees. *Id.* §§ 47-25-1703, -1704, -1705. It also expressly "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." *Id.* § 47-25-1708(a). It does not affect contractual remedies, *id.* § 47-25-1708(b)(1), or

"[o]ther civil remedies that are not based upon misappropriation of a trade secret," *id.* § 47-25-1708(b)(2).

The Tennessee Supreme Court has not construed the scope of the TUTSA's displacement provision, and the Tennessee Court of Appeals has done so only once and, in that case, adopted the standard articulated in *Hauck Manufacturing*. *See Ram Tool & Supply Co., Inc. v. HD Supply Const. Supply, Ltd.* ("*Ram Tool I*"), No. M2013-02264-COA-R3CV, 2014 WL 4102418, at *12 (Tenn. Ct. App. Aug. 19, 2014), *appeal granted on other grounds, cause remanded* (Tenn. Nov. 24, 2015).[16] The Sixth Circuit, in an unreported opinion, has implicitly approved the *Hauck* standard, *PartyLite Gifts, Inc. v. Swiss Colony Occasions*, 246 F. App'x 969, 976 (6th Cir. 2007), and it has also been adopted by the other district courts in Tennessee. *See, e.g.*, *RN Ent., LLC v. Clement*, 380 F. Supp. 3d 720, 721 (M.D. Tenn. 2019) (Crenshaw, C.J.); *J.T. Shannon Lumber Co., Inc. v. Barrett*, No. 2:07-CV-2847-JPM-CGC, 2010 WL 3069818, at *11 (W.D. Tenn. Aug. 4, 2010).

In *Hauck*, the court adopted what is known as the "same proof" test, pursuant to which:

> a claim will be preempted when it necessarily rises or falls based on whether the defendant is found to have 'misappropriated' a 'trade secret' as those two terms are defined in the UTSA. Stated another way, if proof of a non-UTSA claim would also simultaneously establish a claim for misappropriation of trade secrets, it is preempted irrespective of whatever surplus elements or proof were necessary to establish it. . . . If a proven claim, whether in whole or part, constitutes misappropriation of trade secret, it is that and that alone.

*Hauck*, 375 F. Supp. 2d at 658.

---

[16] The Tennessee Supreme Court remanded for reconsideration based on its intervening opinion in *Rye v. Women's Care Center of Memphis, MPLLC*, 477 S.W.3d 235 (Tenn. 2015), which altered Tennessee's standard of review of summary judgment motions to match the federal standard.

Thus, Techmatic's "Tennessee state-law claims may only go forward to the extent that [the plaintiff] state[s] a claim for relief in the absence of the misappropriation allegations." *Knox Trailers, Inc. v. Maples*, 581 F. Supp. 3d 1000, 1010 (E.D. Tenn. 2022).

To consider that question, the court must determine whether the alleged activities involve trade secret misappropriation. The TUTSA defines trade secret as:

> information, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process, or plan that:
>
> > (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
> >
> > (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Tenn. Code Ann. § 47-25-1702(4). The TUTSA's definition of trade secret "is sufficiently broad to include information which at common law would have been considered confidential information." *Hamilton-Ryker Grp., LLC v. Keymon*, No. W2008-0936-COA-R3-CV, 2010 WL 323057, at *14 (Tenn. Ct. App. Jan. 28, 2010). At common law, "trade secret" encompassed most information "used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not use it." *Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 588 (Tenn. Ct. App. 2001). "To constitute a trade secret, it must be difficult for anyone outside the confidential relationship to acquire the information through proper means." *Id.* (citing *Hickory Specialties, Inc. v. B & L Labs., Inc.*, 592 S.W.2d 583, 587 (Tenn. Ct. App. 1979)).

"Misappropriation" is defined by TUTSA as

(A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(i) Used improper means to acquire knowledge of the trade secret; or

(ii) At the time of disclosure or use, knew or had reason to know that that person's knowledge of the trade secret was:

(a) Derived from or through a person who had utilized improper means to acquire it;

(b) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(c) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii) Before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake;

Tenn. Code. Ann. § 47-25-1702(2).

### 1.  *Breach of Fiduciary Duties (Count V)*

Techmatic asserts a claim for breach of fiduciary duty against Schroer, Murphy, O'Rourke, and Greve. In support of this claim, it alleges that these defendants breached their fiduciary duties by: (1) stealing, maintaining, and sharing Techmatic's confidential customer data and formulas and other confidential information and trade secrets with PSI; (2) permanently deleting data, including data proving their wrongdoing, from their Techmatic-issued laptop computers before returning those computers to Techmatic; (3) visiting customers with PSI representatives while still employed by Techmatic; (4) sending customer photographs to Schroer while still employed by Techmatic; and (5) soliciting Techmatic customers on behalf of PSI while still employed. (SAC ¶¶ 171.)

Insofar as the breach of fiduciary duty claim is premised upon the defendants' allegedly stealing and sharing with PSI Techmatic's confidential trade secret information, that portion of the claim is clearly preempted. However, to the extent the claim is premised upon the defendants' allegedly visiting and soliciting Techmatic's customers while still employed by Techmatic for the

purpose of luring them to PSI, the claim does not necessarily depend on the theft or use of confidential information and is not preempted. Likewise, the claim based on the defendants' allegedly deleting data evidencing their wrongdoing would not be preempted. *Accord Knox Trailers*, 581 F. Supp. 3d at 1011 ("A breach of fiduciary duty claim may be preempted under the 'same proof' test, if that claim 'is based on a misappropriation of protected information.' 'To the extent a plaintiff alleges that a defendant has otherwise engaged in conduct adverse to its interests, however, [a breach-of-fiduciary-duty claim] is not preempted.'" (quoting *RN Ent., LLC v. Clement*, 380 F. Supp. 3d 711, 720 (M.D. Tenn. 2019); *PGT Trucking Inc. v. Jones*, No. 15-1032, 2015 WL 4094265, at *4 (W.D. Tenn. July 7, 2015))).

Accordingly, the Court will not dismiss the breach of fiduciary duty claim at this juncture, because it is not wholly preempted by the TUTSA.

### 2. Interference with Contractual Relationships (Count VII)

The court construes Count VII as a claim for unlawful inducement of breach of contract. To establish this claim, "a plaintiff must prove that there was a legal contract, of which the wrongdoer was aware, that the wrongdoer maliciously intended to induce a breach, and that as a proximate result of the wrongdoer's actions, a breach occurred that resulted in damages to the plaintiff." *Quality Auto Parts Co. v. Bluff City Buick Co.*, 876 S.W.2d 818, 822 (Tenn. 1994).

Count VII is asserted against Schroer, Greene, and PSI. Under Count VII, the plaintiff alleges the bare bones of an inducement of breach claim: that it had valid Confidentiality Agreements in place with Schroer, Murphy, O'Rourke, and Greve and Non-Compete agreements with O'Rourke and Greve; that the defendants were aware of these contracts; that Greene and PSI induced Schroer to breach his Confidentiality Agreement and that Greene, PSI, and Schroer induced Murphy, O'Rourke, and Greve to breach their agreements; and that Schroer, Murphy, O'Rourke, and Greve actually breached their contracts, causing Techmatic damages. (SAC ¶¶

186–97.) The allegations set forth under Count VII, standing alone, do not make sufficiently clear the basis for the claim.

The factual allegations in the body of the SAC, however, establish that the Confidentiality Agreements required the Techmatic employees to maintain the confidentiality of Techmatic's confidential proprietary information and that the employees breached the Confidentiality Agreements by misusing and misappropriating Techmatic's confidential information. (*See* SAC ¶¶ 182, 183 ("Schroer, Pat Murphy, O'Rourke, and Greve breached their Confidentiality Agreements by sharing confidential information, including but not limited to customer lists, other customer information, proprietary chemical formulas, supplier information, profit margins, and other pricing information, with PSI and/or Pavco" and "by retaining copies of the hard drives of their Techmatic-issued work computers.").) Thus, insofar as the inducement claim is based on the identified defendants' having allegedly induced Techmatic's employees to breach their Confidentiality Agreements by disclosing to PSI Techmatic's confidential, protected information, it is preempted by the TUTSA, because proof of the claim will necessarily require proof that the individual employees engaged in the misappropriation and disclosure of Techmatic's protected trade secret information. *Accord Hauck Mfg.*, 375 F. Supp. at 659 (finding the tortious interference with contract claims preempted to the extent that they were premised upon the breach of contract provisions relating to the disclosure of confidential information).

At the same time, however, the claim is not preempted, insofar as it is premised upon the inducement of the breach of the Non-Compete Agreements signed by O'Rourke and Greve, because proof of the inducement to breach the Non-Compete Agreements would not necessarily implicate Techmatic's confidential information. Rather, the Non-Compete Agreements "contain restrictions against working for a business substantially similar to or competitive with Techmatic

for three years following the termination of their employment with Techmatic." (SAC § 102.) Greve and O'Rourke allegedly breached these agreements by going to work for PSI, not by disclosing trade secret information. (*See* SAC ¶ 181 ("O'Rourke and Greve breached the Non-Compete Agreements by accepting employment with PSI—a business both substantially similar to, and competitive with, Techmatic.").)

In sum, the inducement claim is preempted only insofar as it is premised upon the defendants' allegedly inducing the Techmatic employees to breach their Confidentiality Agreements, but not insofar as it is premised upon inducing O'Rourke and Greve to breach their Non-Compete Agreements. With that limitation in place, the court will not dismiss the inducement of breach of contract claim at this juncture, because it is not wholly preempted by the TUTSA.

### 3. Interference with Supplier Relationship (Count VIII)

Techmatic asserts that PSI, Greene, Schroer, Murphy, O'Rourke, and Greve interfered with its supplier relationships with Pavco and other suppliers. The court construes this claim as one for intentional interference with business relationships, a tort recognized by the Tennessee Supreme Court. *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002). The elements of such a claim are:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means[;] and finally, (5) damages resulting from the tortious interference.

*Id.* (internal citation and footnotes omitted). To prove an improper motive, the plaintiff must show that the defendant's "predominant purpose was to injure the plaintiff." *Id.* at 701 n.5. While noting that a precise or all-encompassing definition of "improper means" was neither possible nor helpful, the court nonetheless explained that the term encompasses basically any "means that are illegal or

independently tortious," including the "misuse of inside or confidential information, or breach of a fiduciary relationship," and "unfair competition." *Id.*

In support of this business interference claim, the plaintiff essentially recites the elements of the cause of action: that it had longstanding relationships with suppliers, including Pavco and other specifically identified entities; that the defendants were aware of these relationships; that the defendants intended to, and did, cause the termination of those relationships using "improper means, including redirecting customer inquiries and orders away from Techmatic and spreading misinformation about Techmatic to various participants in the metal finishing industry"; and that Techmatic suffered damages as a result of the defendants' tortious interference. (SAC ¶¶ 199–205.)

The defendants argue that this claim is preempted, because it is "substantially predicated upon the 'theft of trade secrets.'" (Doc. No. 84, at 10.) On its face, however, the claim is not substantially predicated on the theft of trade secrets. Rather, it is predicated on the defendants' allegedly directing customers away from Techmatic and toward PSI and on their allegedly spreading misinformation about Techmatic. (*See* SAC ¶¶ 72–74, 107, 203, 204.) Likewise, Techmatic alleges that Schroer "set up several of Techmatic's suppliers to use PSI as a new distributor in Techmatic's geographical sales area, falsely telling the suppliers that Techmatic was going out of business." (SAC ¶ 80.)

Insofar as the tortious interference claim premised on these allegations can be proved without relying on evidence of the transmission or misappropriation of trade secrets, it is not preempted. The motion to dismiss this claim, therefore, will be denied.

4.    *Interference with Customer Relationships (Count IX)*

Count IX of the SAC for "interference with customer relations" is asserted against all defendants. This claim, too, is more properly characterized as a claim for intentional interference

with business relationships. The PSI defendants move for dismissal of this claim on the grounds that it is preempted by the TUTSA. (Doc. No. 84, at 11.) Pavco echoes that argument and additionally asserts that the plaintiff fails to allege that its refusal to deal with Techmatic was improper. (Doc. No. 91, at 18–19.)

*a)*     *Allegations in Support of the Intentional Interference Claim Against the PSI Defendants*

Under Count IX, Techmatic again simply recites the elements of the cause of action: that it had longstanding customer relationships; that the defendants were aware of these relationships; that the defendants intended to, and did, cause the termination of those relationships using "improper means, including stealing, using, and destroying copies of trade secrets and confidential information related to Techmatic's customer relationships, redirecting business opportunities from Techmatic to PSI, disrupting Techmatic's supplier relationship with Pavco in a way that compelled Techmatic's customers to do business with PSI, racketeering, and spreading misinformation about the financial stability of Techmatic"; and that Techmatic and its customers were injured by the defendants' interference. (SAC ¶¶ 207–11.)

Although Count IX does not contain actual facts to support the claim, it incorporates by reference the factual allegations set forth elsewhere in the SAC. (SAC ¶ 206.) Certainly, insofar as this claim is directed against the PSI defendants and is premised upon their misuse of Techmatic's confidential information, it is preempted. Thus, for example, the plaintiff alleges that Murphy, Greve, and O'Rourke, while still employed by Techmatic, intentionally encouraged Techmatic to develop distributor relationships with other suppliers and then told Pavco about these relationships, thus transmitting trade secrets and other confidential information, in order to provide Pavco a pretext for terminating its relationship with Techmatic. (*See, e.g.*, SAC ¶¶ 76–77.) Insofar as proof of this aspect of the claim is reliant upon proof of trade secret misappropriation, it is

preempted.

However, to the extent the claim is based on allegations that the PSI defendants breached a duty of loyalty by "spreading misinformation about the status and financial viability of Techmatic to Techmatic's customers and other individuals in the industry" and soliciting customers on behalf of PSI, all while they were still employed by Techmatic (SAC ¶¶ 72, 73, 97), the claim is not dependent upon proof of trade secret misappropriation and, therefore, is not entirely preempted. This type of activity would qualify as "improper means" under the *Trau-Med* definition and does not require proof of trade secret misappropriation. The claim, therefore, is not entirely preempted.

b) *Intentional Interference Claim Against Pavco*

The claim against Pavco appears to be based on allegations that Pavco interfered with Techmatic's customer relationships by refusing to supply Pavco products to Techmatic, as a result of which Techmatic could no longer distribute Pavco products to its customers.

Notably, "a person engaged in business may, at his election, and without good reason, refuse to deal with some other person." *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 178 (Tenn. Ct. App. 2007) (quoting *Crumley v. Watauga Water, Co.*, 41 S.W. 1058, 1059 (Tenn. 1897)). Based on this longstanding rule, the court in *Watson's Carpet* held that a manufacturer's simple refusal to deal is not actionable and, therefore, reversed a judgment in favor of the plaintiff on its tortious interference claim against a carpet manufacturer, where the "sole basis of the judgment [was the defendant's] refusal to sell" a specific type of carpet to the plaintiff, which disrupted the plaintiff's ability to supply that carpet to its long-term customer. *Id.* at 177. In reaching that decision, however, the court specifically observed that the plaintiff failed to present any proof of affirmative wrongdoing on the part of the carpet manufacturer, such as defaming or disparaging the plaintiff to its customer, or proof that the defendant manufacturer's

decision not to do business was based on any "impermissible or independently unlawful reason." *Id.* at 177 & n.5, 178 n.6.

Pavco argues that there was nothing inherently improper about its decision to terminate Techmatic as a distributor and that the claim is preempted, insofar as Techmatic's TUTSA and tortious interference claims are both based on allegations that "Pavco's decision to terminate Techmatic was based on other defendants' misappropriation of trade secrets." (Doc. No. 91, at 19 (citing SAC ¶¶ 77, 81).) The plaintiff argues in response that "TUTSA does not preempt Techmatic's interference claim against Pavco because Pavco interfered with Techmatic's business relationships by 'redirecting business opportunities from Techmatic to PSI, . . . racketeering, and spreading misinformation about the financial stability of Techmatic' while actively preventing Techmatic from servicing its customers." (Doc. No. 100, at 17–18 (citing SAC ¶¶ 209–10).)

The court has already determined that the SAC fails to state a claim based on racketeering, however, and the SAC, in any event, does not actually allege that *Pavco*, or any individual employed by Pavco, spread misinformation about Techmatic or did anything to prevent Techmatic's customers from continuing to deal with Techmatic—except simply by terminating Techmatic as a distributor. Rather, it alleges that Pavco engaged in a conspiracy with the other defendants, making Pavco equally liable with the other defendants under a conspiracy theory of liability. That theory is addressed below. At this juncture, the court finds that the factual allegations in the SAC do not establish a tortious interference claim directly against Pavco for which relief can be granted, even to the extent such a claim is not preempted by the TUTSA.

### 5.    *Civil Conspiracy (Count II)*

The elements of civil conspiracy under Tennessee common law are "(1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4)

resulting injury." *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006) (citation omitted). "In addition, civil conspiracy requires an underlying predicate tort allegedly committed pursuant to the conspiracy." *Hauck Mfg.*, 375 F. Supp. 2d at 660 (citation omitted). Importantly, "conspiracy claims must be pled with some degree of specificity and . . . vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim." *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 368 (6th Cir. 2012) (citation omitted). "Put simply, under Tennessee law, an actionable civil conspiracy is 'a combination of two or more persons who, each having the intent and knowledge of the other's intent, accomplish by concert an unlawful purpose by unlawful means, which result in damage to the plaintiff.'" *RN Ent., LLC v. Clement*, 380 F. Supp. 3d 711, 721–22 (M.D. Tenn. 2019) (quoting *Trau-Med*, 71 S.W.3d at 703).

As the Tennessee Court of Appeals has explained, however, "[c]onspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Foster Bus. Park, LLC v. Winfree*, No. M2006-02340-COA-R3-CV, 2009 WL 113242, at *16 (Tenn. Ct. App. Jan. 15, 2009) (internal citations omitted). Thus, a co-conspirator, simply by participating in a conspiracy, "effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy. In this way, a coconspirator incurs tort liability co-equal with the immediate tortfeasors." *Id.*

The SAC here asserts, as Count II, a claim of "conspiracy," in support of which it asserts that all of the defendants engaged in a common design, the purpose of which was to cause improper gains for the defendants and "financial ruin for Techmatic"; that numerous "overt acts" were committed in furtherance of the conspiracy; and that Techmatic was in fact injured thereby. (SAC ¶¶ 143–46.) Count II includes a non-exhaustive list of five "overt acts," several of which—but not

all—involve the misappropriation of trade secrets. Only one of the asserted "overt acts" even references Pavco: that "Schroer, Pat Murphy, O'Rourke, and Greve transmit[ed] copies of Techmatic's files which included originals, as well as evidence of their individual and collective wrongdoing, to themselves or others and then deleting all data on Techmatic computers for the benefit of, and with the assistance, direction, and encouragement of PSI, Greene, Pavco, and others." (SAC ¶ 145(d).)

The PSI defendants argue that Techmatic's conspiracy claim is entirely preempted, because "it is substantially predicated upon allegations that the Defendants misappropriated Plaintiff's trade secrets and confidential information." (Doc. No. 84, at 8.) Clearly, to the extent the conspiracy claim is premised upon allegations of trade secret misappropriation, it is preempted by the TUTSA. However, as set forth above, not all of Techmatic's underlying tort claims against the PSI defendants are preempted, and the same allegations that support those claims generally also support the conspiracy claim related to those specific torts—including breach of fiduciary duty and the tortious interference claims. The conspiracy theory as it relates to the PSI defendants, at least, is not entirely preempted, for the same reasons that the underlying tort claims are not entirely preempted.[17]

For its part, Pavco argues that, aside from preemption, the SAC "simply does not plead, with any 'degree of specificity,' *facts* that plausibly establish this claim." (Doc. No. 91, at 21 (quoting *Kincaid*, 221 S.W.3d at 38).) With respect to Pavco, the court agrees. The SAC does not contain any facts regarding any overt act taken by any individual acting on behalf of Pavco, other

---

[17] The PSI defendants have not sought dismissal based on the intracorporate conspiracy doctrine, and it appears that, although Murphy, Greve, and O'Rourke are now employed by PSI, at the time they allegedly engaged in most of the wrongful activity, they were still employed by Techmatic, suggesting that the doctrine would not apply.

than the allegation that "Pavco contacted Greve, Pat Murphy, and O'Rourke directly on January 18, 2020 to tell them not to attend Pavco's sales meeting on January 19, 2020" (SAC ¶ 82), and it allegedly co-authored the transition notice with PSI and its agents. (*See* SAC ¶¶ 84–87.) Although the individuals allegedly conveyed Techmatic's customer information to Pavco, there are simply no allegations that, if true, would establish Pavco's knowledge of or involvement in those defendants' theft of trade secrets and other disloyal acts or their intent to damage the plaintiff or destroy its business.

The allegations against Pavco are entirely conclusory and are insufficient to establish Pavco's involvement in the alleged conspiracy. This claim, too, will be dismissed as to Pavco.

## IV. CONCLUSION

For the reasons set forth herein, the court will grant Pavco's Motion to Dismiss (Doc. No. 90) in its entirety, thus dismissing all claims asserted against Pavco. The PSI defendants' Partial Motion to Dismiss will be granted with respect to the civil RICO claim (Count I) and the Sherman Act claims (Counts III and IV), but otherwise denied, even though it is clear that the plaintiff's state law claims are partially preempted, to the extent the plaintiff relies on trade secret misappropriation in support of those claims.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge