**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

|  |  |  |
|---|---|---|
| **TECHMATIC, INC.,** | ) | |
| | ) | |
| **Plaintiff/Counter-Defendant,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:20-cv-01078** |
| | ) | **Judge Aleta A. Trauger** |
| **PLATING SPECIALISTS, INC.,** | ) | |
| **PATRICK MURPHY, BARRY** | ) | |
| **SCHROER, MICHAEL O'ROURKE,** | ) | |
| **HENDRIK GREVE, BRIAN GREENE,** | ) | |
| **and PAVCO, INC.,** | ) | |
| | ) | |
| **Defendants/Counter-Plaintiffs.** | ) | |

**MEMORANDUM**

Before the court is plaintiff Techmatic, Inc.'s Motion to Dismiss the Second Amended

Counterclaims ("SACC") filed by defendants Plating Specialists, Inc. ("PSI") and Barry Schroer

(collectively, the "counterclaimants," unless necessary to distinguish between them). (Doc. No.

92.) The counterclaimants oppose the motion (Doc. No. 98), and Techmatic, Inc. ("Techmatic")

has filed a Reply (Doc. No. 102). For the reasons set forth herein, the motion will be denied.

**I.      THE FACTS ALLEGED IN THE SACC[1]**

PSI and Techmatic are both suppliers of chemicals used to apply coatings on metal and

auxiliary equipment for the metal finishing industry. Schroer was employed by Techmatic from

1994 until his resignation on May 17, 2018. While employed by Techmatic, he signed a

Confidential Information Agreement ("Confidentiality Agreement"), which is attached as an

---

[1] All of the facts set forth herein are drawn from the SACC (Doc. No. 85) and exhibits
thereto. The court provides citations to the record only when employing direct quotations.

exhibit both to the plaintiff's Second Amended Complaint and the SACC. He is currently employed by PSI.

Until January 19, 2020, both Techmatic and PSI were distributors of products manufactured or supplied by Pavco, Inc. ("Pavco"). On that date, Pavco terminated its relationship with Techmatic, as a result of which Techmatic was no longer authorized to distribute Pavco products. Pavco unilaterally decided to terminate its relationship with Techmatic. As its president explained to Techmatic's president in a text message, Pavco terminated the relationship because Techmatic had "chose[n] to continue marketing products against Pavco's products," despite having verbally "re-commit[ted] to [an] Exclusive Distribution relationship with Pavco." (SACC ¶ 14; Doc. No. 85-1.) The counterclaimants deny any role in, or advance knowledge of, Pavco's decision to terminate its distributor relationship with Techmatic.

PSI had historically been the authorized distributor of Pavco products in a region that comprised Indiana, Kentucky, Ohio, Arkansas, Oklahoma, and Texas. After Pavco terminated its relationship with Techmatic, it selected PSI as its distributor in the geographic region in which Techmatic had historically sold Pavco products, which included Alabama, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and Tennessee (the "Southeast Region").

Pavco announced its selection of PSI as its new distributor in the Southeast Region by sending a letter on January 23, 2020 (the "Pavco Letter," Doc. No. 85-2) to Pavco's "end-user" customers, informing them that PSI would be its new representative in the Southeast Region and directing customers to contact Barry Schroer at PSI to order Pavco products. Pavco sent the letter to customers who had previously purchased Pavco products through Techmatic. PSI and Schroer specifically allege that they "did not provide any information of Techmatic to Pavco in relation to the Pavco Letter." (SACC ¶ 19.)

Techmatic, in response, sent its own letter (the "Techmatic Letter," Doc. No. 85-3) to its current and former customers in the Southeast Region that had previously purchased Pavco products through it. The Techmatic Letter stated in relevant part:

> As of Sunday, January 19, 2020, we no longer distribute products from Pavco Inc.
>
> Also, on Tuesday of this week, we received word that all of our customers that buy Pavco products from us, received an email stating that Barry Schroer of [PSI] is your new contact for ordering all of your Pavco products.
>
> Barry Schroer resigned from Techmatic Inc. on May 17, 2018 and joined [PSI,] one of our competitors . . . . This solicitation of your business, violates the Confidential[ity Agreement Schroer] has signed with Techmatic Inc.
>
> . . . . I encourage you to contact Pavco Inc. direct[ly] . . . to place your future Pavco orders. They will be helpful in getting your orders out to you in a timely manner. This only applies to the Pavco items you buy from us.

(Doc. No. 85-3.)

According to PSI, it was not a competitor of Techmatic until Pavco selected it as its distributor in the Southeast Region.

In addition, Barry Schroer was not required to sign a non-competition agreement or a non-solicitation agreement when he was employed by Techmatic. He did sign the Confidentiality Agreement. By signing this agreement, Schroer agreed not to "use for [himself] or others, or disclose or divulge to others any trade secrets, confidential information, or other data" of Techmatic, both during and after his employment with Techmatic. (SACC ¶ 26; Doc. No. 85-4, at 2.)

Neither Schroer nor PSI disclosed or provided to Pavco a customer list or any other customer information belonging to Techmatic, in connection with Pavco's preparation and dissemination of the Pavco Letter. Schroer never disclosed protected information in violation of the Confidentiality Agreement. Schroer made PSI aware of the Confidentiality Agreement before he was hired by PSI, and PSI and Schroer have continuously complied with its provisions.

The SACC asserts that the Techmatic Letter, by stating that Schroer resigned from Techmatic and went to work for PSI, "specifically link[ed] Mr. Schroer and [PSI] together by virtue of the employment relationship between the parties." (SACC ¶ 33.) The SACC further asserts that the Techmatic Letter contains a provably false mixed statement of fact and law, insofar as it "falsely accus[es] both Mr. Schroer and [PSI] of acting in concert to solicit the business of the customer[s] who received the Techmatic Letter, in a manner that violates the Confidential[ity Agreement]." (SACC ¶ 34.) The specific sentence identified as provably false is as follows: "This solicitation of your business violates the Confidential[ity Agreement Schroer] has signed with Techmatic Inc." (SACC ¶ 34.)

The SACC asserts that the quoted sentence is provably false in several ways. First, it is false because "neither Mr. Schroer nor [PSI] has a legal obligation to refrain from soliciting Techmatic's former, existing, or potential customers under the Confidential[ity Agreement] or otherwise." (SACC ¶ 38.) Second, even if had such a legal obligation, the Pavco letter is not a solicitation of Techmatic's customers by Schroer or PSI, because it is based on Pavco's own knowledge of its own customers' identities and not on a disclosure of Techmatic's confidential customer information by Schroer or PSI. The SACC specifically denies that Schroer made any prohibited disclosure of confidential information or otherwise violated the Confidentiality Agreement.

The SACC avers that the sentence quoted from the Techmatic Letter constitutes a false and defamatory statement made to PSI's customers or potential customers in the Southeast Region for the purpose of interfering with PSI's prospective and existing customers in the Southeast Region and that it did actually interfere with PSI's business relationships with prospective and existing customers in the Southeast Region. The SACC further claims that the allegedly false and

defamatory statement was intended to, and actually did, result in harm to the counterclaimants' character and reputation. The SACC alleges that Techmatic knew that the statement was false when it was made or that it made the statement with reckless disregard for its truth or "negligence in failing to ascertain the truth of the statement[]." (SACC ¶ 46.)

The SACC also contends that, by directing "customers of [PSI] in the Southeast Region to contact Pavco, not [PSI], directly to place future orders, Techmatic intended to and did interfere with [PSI's] relationships with its customers in the Southeast Region." (SACC ¶ 49.) The counterclaimants specifically identify eight prospective customers who received the Techmatic Letter. Attached to the SACC is a letter from one of these, Volunteer Fastener and Supply ("Volunteer"). ("Volunteer Letter," Doc. No. 85-5.) According to the SACC, the Volunteer Letter demonstrates that Volunteer elected not to transfer its business to PSI due to the Techmatic Letter and that, but for its receipt of the Techmatic Letter, Volunteer "would have transferred, developed, and/or expanded its business with [PSI], especially in relation to Pavco products." (SACC ¶ 54.) The SACC asserts that Volunteer is just one member of an "identifiable class of third parties . . . who received the Techmatic Letter and—but for [the Letter]—would have maintained, developed and/or expanded business with [PSI]." (SACC ¶ 55.)

In connection with these allegations, both of the counterclaimants bring a cause of action against Techmatic for defamation, and PSI additionally asserts a claim for "interference with customer relationships," which the court construes as a claim for intentional interference with business relationships, a tort recognized by the Tennessee Supreme Court. *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002).

Techmatic seeks dismissal of both counterclaims under Rule 12(b)(6), on the basis that the counterclaimants fail to allege facts sufficient to state claims either for defamation or intentional

interference. The counterclaimants dispute that assertion.

## II. STANDARD OF REVIEW

To survive the motion to dismiss, the SACC must provide "a short and plain statement of the claim showing that [the counterclaimants are] entitled to relief." Fed. R. Civ. P. 8(a)(2). When considering whether the SACC does so, the court accepts as true its factual allegations and draws all reasonable inferences in the counterclaimants' favor, but the court must disregard any legal conclusions. *Doe v. Baum*, 903 F.3d 575, 580–81 (6th Cir. 2018). The court, in addition, disregards in their entirety Techmatic's allegations in the Second Amended Complaint, as the court is required to accept as true, for purposes of reviewing a motion to dismiss the SACC, the factual allegations in the SACC itself.[2]

The factual allegations in the SACC will suffice if they "'plausibly suggest[]' that [the counterclaimants] can meet the elements of [their] claim[s]," *id.* at 580 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)), and allow the court "to draw the reasonable inference" that Techmatic would be liable if the counterclaimants can prove their alleged facts, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III. DISCUSSION

### A. Defamation Claim

A plaintiff asserting a defamation claim under Tennessee law "must establish that: 1) a party published a statement; 2) with knowledge that the statement is false and defaming to the other; or 3) with reckless disregard for the truth of the statement or with negligence in failing to

---

[2] In support of its Motion to Dismiss, Techmatic provides a lengthy summary of the facts—in which it cites almost exclusively to its Second Amended Complaint rather than to the SACC. (Doc. No. 93, at 2–4.) Techmatic's version of the (obviously disputed) facts, however, is simply irrelevant to an analysis of whether the SACC states colorable claims for relief.

ascertain the truth of the statement." *Sullivan v. Baptist Mem. Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999).

Tennessee "recognize[s] the doctrine of defamation by innuendo or implication." *Isbell v. Travis Elec. Co.*, No. M1999-00052-COA-R3-CV, 2000 WL 1817252, at *6 (Tenn. Ct. App. Dec. 13, 2000) (citing *Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412 (Tenn. 1978)). As the court explained in *Isbell*,

> *Nichols* stands for the proposition that statements literally true may be actionable if they imply facts that are not true. The rationale behind this rule is that, when truthful statements carry a defamatory innuendo, the factual implication should also be true to justify the implication. The proper question is whether the meaning reasonably conveyed by the published words is reasonably understood in a defamatory sense by the reader or listener.

*Id.* (internal quotation marks and citations omitted).

Techmatic does not dispute that a defaming statement was published. Rather, it contends that the defamation claim is subject to dismissal as to PSI, because the only statement the counterclaimants identify with precision as being provably false and defamatory—that Schroer's solicitation of Techmatic's customers' business violated his Confidentiality Agreement with Techmatic—is about Schroer, not PSI, as a result of which PSI does not have standing to assert a defamation claim. Second, Techmatic argues that Schroer fails to plausibly plead that Techmatic defamed him, because (a) the fact that Schroer had a Confidentiality Agreement with Techmatic is both true and undisputed; (b) "[t]he statement that Schroer violated that agreement is a reasonable conclusion from the undisputed facts that Schroer resigned from Techmatic and was then identified to 'all of [Techmatic's] customers that buy Pavco products from [Techmatic]' as their new point of contact for future purchases" (Doc. No. 93, at 8 (quoting SACC ¶ 31 and Doc. No. 85-3)); (c) it is true or at least reasonable for Techmatic to believe that Schroer was soliciting Techmatic customers and also reasonable for Techmatic to believe that "Schroer's involvement in

a letter sent to a secret list of Techmatic customers violated his confidentiality obligations" (Doc. No. 93, at 9); (d) the allegations that Techmatic published the statement with actual knowledge of its falsity or reckless or negligent disregard for its truth are entirely conclusory and unsupported by actual facts, and no specific allegations in the SACC "undermine the reasonableness or sincerity of Techmatic's conclusion" that Schroer had provided confidential customer information to Pavco in violation of his Confidentiality Agreement (Doc. No. 93, at 10).

The allegedly defamatory statement at issue, again, is simply this one: "This solicitation of your business, violates the Confidential Information Agreement [Schroer] has signed with Techmatic Inc." (Doc. No. 85-3.) Considered in context, however, the statement is accompanied by the statement that Techmatic had learned that Schroer, who was formerly employed by Techmatic but is now employed by Techmatic's competitor, PSI, was the new customer contact for Pavco orders. The phrase, "[t]his solicitation," therefore, can reasonably be understood to mean that Schroer was engaged in "soliciting" Techmatic's customers *on behalf of PSI*. In other words, the statement arguably implies that both Schroer and PSI were engaged in improper solicitation. As set forth above, Tennessee recognizes defamation by implication. Under this doctrine, "[t]he proper question is whether the *meaning* reasonably conveyed by the published words is defamatory." *Nichols*, 569 S.W.2d at 420. At this juncture, the court finds that a reasonable jury could conclude that the somewhat vague reference to "[t]his solicitation" could refer to solicitation by both PSI and Schroer together and that it carries a defamatory meaning as to both counterclaimants. The court rejects Techmatic's standing argument as to PSI.

Regarding Techmatic's other arguments, the allegedly defamatory statement references Schroer's Confidentiality Agreement which, on its face, does not bar Schroer from soliciting Techmatic's customers or competing against Techmatic. Techmatic's statement to the contrary is

demonstrably false, and Techmatic knew or should have known that the statement was false when made. Techmatic's arguments about whether it reasonably believed that Schroer had violated the Confidentiality Agreement by providing a secret list of Techmatic customers to Pavco and PSI are somewhat beside the point,[3] because what it actually *said* in the letter was that Schroer and PSI jointly engaged in violating Schroer's Confidentiality Agreement by soliciting Techmatic's customers. Moreover, the questions of (1) whether Schroer *actually* violated his Confidentiality Agreement by revealing secret customer information to Pavco and PSI and (2) whether Techmatic *reasonably believed* that he had done so are both disputed.

The SACC adequately states a claim for defamation.

## B. Intentional Interference Claim

The elements of a claim for intentional interference with business relationships are:

(1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means[;] and finally, (5) damages resulting from the tortious interference.

*Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (internal citation and footnotes omitted). To prove an improper motive, the plaintiff must show that the defendant's "predominant purpose was to injure the plaintiff." *Id.* at 701 n.5. While noting that a precise or all-encompassing definition of "improper means" was neither possible nor helpful, the Tennessee Supreme Court in *Trau-Med* nonetheless explained that the term generally encompasses "those means that are illegal or independently tortious," including, among other examples of tortious

---

[3] It bears emphasizing that Techmatic's arguments are largely premised upon the (disputed) allegations in its Second Amended Complaint, rather than the facts alleged by the counterclaimants in the SACC. Again, for purposes of Techmatic's motion, the court must accept as true the facts set forth in the SACC.

conduct, defamation. *Id.*

Techmatic argues that the SACC fails to allege "improper motive, improper means, or damages," as a result of which the intentional interference claim must be dismissed. Notably, however, the claim requires a plaintiff to prove improper motive *or* improper means, and, here, the counterclaimants allege improper means: defamation.

As for damages, Techmatic asserts that the SACC "does not even attempt to specify an 'identifiable class of third persons' from whom it lost existing or prospective business." (Doc. No. 93, at 14.) This argument is utterly baffling in light of the fact that the SACC actually identifies with specificity eight "customers and potential customers" of PSI in the Southeast Region, including Volunteer. (SACC ¶¶ 73.) In addition, the SACC makes it clear that the class from which it lost prospective business includes all of the companies, including but not limited to the eight identified in the SACC, that received Techmatic's allegedly defamatory letter effectively accusing PSI of improperly soliciting Techmatic's customers. (*See* SACC ¶ 20 ("Techmatic issued a letter on January 24, 2020, to its current and former customers in the Southeast Region who had purchased Pavco products through Techmatic in the past."); *id.* ¶ 55 ("Volunteer Metal is part of an identifiable class of third parties . . . who received the Techmatic Letter and—but for Techmatic's tortious conduct giving rise to these Counterclaims—would have maintained, developed and/or expanded business with Plating Specialists.").)

Techmatic further argues that the Volunteer Letter attached as an exhibit to the SACC "actually demonstrates that PSI did not lose profits related to Volunteer Metal's ongoing use of Pavco products." (Doc. No. 93, at 15; *see also* Doc. No. 85-5.) Regarding the Volunteer Letter, the SACC explains that Techmatic served a subpoena on Volunteer "requesting certain business documents." (SACC ¶ 51.) The cover letter accompanied by Volunteer's production of documents

in response to Techmatic's subpoena states in relevant part:

> Volunteer Fastener and Supply, Inc. has no intention of transferring our business from Techmatic to PSI other than for the PAVCO Yellow T Chromate which we were told Techmatic can no longer supply us. . . . We contacted PAVCO directly through the website and were directed to PSI based on territory for purchase of chemicals.

(SACC ¶ 52; Doc. No. 85-5.) Techmatic's argument appears to be that, since Pavco directed Volunteer to contact PSI directly to purchase the referenced product, PSI did not actually lose any profits relating to Volunteer's purchase of Pavco products. In response, PSI argues that it has adequately alleged damages, and it points out that the cases on which Techmatic relies in support of its damages argument were decided on summary judgment, not on motions to dismiss.

PSI has adequately alleged damages. Among other things, it alleges that, but for Techmatic's letter, Volunteer and others "would have transferred, developed and/or expanded [their] business with [PSI], especially in relation to Pavco products." (SACC ¶ 54.) The fact that, as its letter indicates, Volunteer went to PSI only for the bare minimum of products it could not find elsewhere tends to substantiate this assertion. (*See* Doc. No. 85-5.) Moreover, PSI alleges that it "was required to expend extraordinary efforts . . . and use considerable resources to attempt to convince the above listed customers and others, not to end, or refuse to enter into, their business relationships with [PSI] due to the false and defamatory statements made in the Techmatic Letter." (SACC ¶ 60.) At this juncture, no more is required.

## IV. CONCLUSION

The SACC adequately alleges facts in support of the claims for defamation and intentional interference with business relationships. Techmatic's Motion to Dismiss the SACC (Doc. No. 92), therefore, will be denied.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge